KITCHEN et al., Appellants, v. THE ST. LOUIS, KANSAS CITY & NORTHERN RAILWAY COMPANY.

1. **Railroad Corporation**: MANAGEMENT, NOT FRAUDULENT: DIREC- TORS INTERESTED IN CORPORATE CONTRACTS. The North Missouri Railroad Company being heavily indebted and unable to negotiate a sale of its bonds, or otherwise provide the means necessary for the completion of its road, an association was formed, the object of which, as expressed in its articles, was the purchase of the bonds, and ultimately, if found profitable to do so, the purchase of the road itself, provided the association could obtain the control of the company. The bonds were subsequently purchased of the com- pany, and the association was allowed to name a majority of the directors. This transaction being assailed as fraudulent, because the control of the company was surrendered to the association, and because the association looked to the ultimate acquisition of the road; Held, that these facts did not establish fraud. The control of the directory was nothing more than a proper security for the due application of the money advanced on the bonds; and it would not be presumed that the contemplated purchase of the road was intended to be made in any other than a lawful manner and under circumstances which would authorize it.

It was further objected that the transaction was constructively fraudulent, because, at the time of its consummation three of the directors of the company were members of the association; Held, that if this were the fact, it would not make the sale void.

2. **Railroad Corporation Contract**: CONSIDERATION. The proceeds of the bonds mentioned above proving inadequate to complete the road, another association, known as the St. Louis & North Missouri Association, contracted with the company to furnish the money necessary for its completion, and for the payment of certain mort- gage obligations then about to become due, and also to purchase and hold the company harmless from a matured lien on the road then held by the State for $7,000,000. The cash outlay to be made under this contract amounted to about $2,000,000. In pursuance of the terms of the statute which authorized the sale of the State's lien, the association gave a bond in the sum of $500,000 conditioned for the early completion of the road. In return for these assump- tions and liabilities, the company issued to the association $4,000,- 000 of second mortgage bonds, and $5,000,000 of stock; Held, that these were issued upon sufficient consideration.

**Contract with Directors Voidable.** Shortly after the fore- going contract was proposed to the company, and before it was for- mally accepted, several of the directors of the company became

members of the association; *Held*, that this fact rendered the contract, when made, voidable, but not absolutely void.

**Laches of Stockholders.** And it appearing further that the existence of the contract and the issue of the second mortgage bonds had been reported to a meeting of the stockholders shortly after it was made, and that they made no objection and no offer of aid to the company, but permitted the association to proceed and expend its money in building the road; *Held*, that after the lapse of five years it was too late for stockholders to impeach the transaction.

3. **Insolvent Corporation:** CREDITORS MAY COMBINE FOR SELF-PROTECTION WITHOUT FRAUD. Default having occurred in the payment of interest on the second mortgage bonds above mentioned, a sale was made under the mortgage, at which the road was purchased, by an agent, for the Illinois, Missouri & Kansas Association, an association whose capital was subscribed in part by some of the directors and other stockholders of the company, who were also creditors, and by mortgage bondholders and other creditors, but largely, also, by outside parties. This association was formed for the express purpose of buying the road and re-organizing it under a new corporation; *Held*, that there was no fraud in this. The law does not prohibit the creditors of a corporation from combining for the purpose of protecting themselves by purchasing its property when legally brought to sale, provided it is no part of the agreement to prevent competition at the sale or to use any unfair advantage.

**Trustee Selling to Himself.** The trustees who made the sale were themselves members of the association which made the purchase, their interest amounting to one thirty-fourth part of the whole capital of the association; *Held*, that this fact did not render the sale void, but it gave the company the right to redeem, provided the right was exercised within a reasonable time and before the intervention of new equities.

**Acquiescence of cestui que trust.** The second mortgage was executed in 1868, and was reported at the next meeting of the stockholders as a liability of the company. The sale took place in August, 1871. This suit was brought in July, 1873, and the amended petition on which the case was tried, was filed in December, 1874. The plaintiff was all the time a stockholder, was present at the sale, and though he believed the mortgage to be illegal and void, sought no information from the trustees, and made no effort to stop the sale. He subsequently agreed to convert all of his stock into stock of the corporation created by the members of the association for the purpose of owning and operating the road, and did actually so convert, and afterwards sold a part of it for cash. The proceeds of the second mortgage bonds were used in completing the road,

and between the date of the sale and the bringing of this suit, other large sums of money had been expended by the new corporation in improving the road, and more than one-half of its stock had passed into the hands of innocent purchasers. Plaintiff bought the greater portion of his stock in the old company after the road was advertised for sale, at one-tenth to one-twentieth of its par value; *Held*, that these were such circumstances of delay, acquiescence and ratification as cut off the plaintiff's right to redeem. While a *cestui que trust* has a right to come into a court of equity and ask that a sale of trust property made by a trustee to himself be set aside, his coming must be timely; he has no right to lie idly by until new equities arise, and speculate on the success or non-success of the investment or transaction of which he complains, and see others, in good faith and without fraud, by a vast expenditure of money, make that valuable which was before valueless, and then come and ask the aid of the chancellor to enable him to appropriate to himself such benefits and advantages.

**Stockholders Chargeable with Knowledge of Corporate Records.** *Held*, also, that as the plaintiff was a stockholder in the company, and all the facts in relation to the execution of the mortgage, the circumstances under which it was made, and the sale of the bonds were shown by the records of the company, he was chargeable with knowledge of them, and must be held to have been cognizant of the frauds committed, if there were any, especially as he declined to make any inquiries of the trustees making the sale. Ignorance, under such circumstances, may well be imputed to him as knowledge.

4. **Equities of Stockholders when Directors buy Corporate Obligations at a Discount.** The second mortgage not covering certain portions of the property of the North Missouri Railroad Company, the Illinois, Missouri & Kansas Association, for the express purpose of acquiring those portions, bought up the greater part of the floating debt of the company at a discount, caused judgments to be obtained against the company on these claims at their face value, in the name of individual members of the association, had the road with all its property again sold under these judgments and became the purchaser as before. The directors of the North Missouri Railroad Company were at the time members of this association, but they were also creditors of the company to a very large amount, and were liable on its obligations as indorsers, and other members of the association were also creditors to a large amount; *Held*, that none of these circumstances rendered the sale *per se* fraudulent and void. The judgment for the face value of the claims may have been excessive and improper; but before there could be a divestiture of the title acquired under the sale, equity would, at

the very least, require the plaintiffs to repay the amount actually expended in purchasing them.

### Appeal from St. Louis Circuit Court.

*Pope & McGinnis* for appellants.

I. The sale of the North Missouri Railroad under the second mortgage was illegal, for the following reasons: Humphreys and Vail, the trustees making the sale, were purchasers. A trustee in a deed of trust executed to secure a debt of any kind, cannot purchase at his own sale. "A total disability is enjoined to take away all temptation." *Grumley v. Webb*, 44 Mo. 451; *Thornton v. Irwin*, 43 Mo. 153; *Reddick v. Gressman*, 49 Mo. 389; *McNees v. Swaney*, 50 Mo. 388; *Benham v. Rowe*, 2 Cal. 387; *Hull v. Voorhis*, 45 Mo. 555; *Gaines v. Allen*, 58 Mo. 537; *Wormley v. Wormley*, 8 Wheat. 421; *Davoue v. Fanning*, 2 John. Ch. 251; *Michoud v. Girod*, 4 How. 503; Spencer's Eq. Jur., 428; Perry on Trusts, §§ 199, 602 v, 602 w; *Hawley v. Cramer*, 4 Cow. 735, 2 Sug. on Vendors, (7 Am. Ed.) b, p. 887; *Robbins v. Butler*, 24 Ill. 387; Kerr on Fraud & Mist., 155; and this irrespective of the motives of the trustees or the sufficiency of the price paid. *Rea v. Copelin* 47 Mo. 83; *Moore v. Moore*, 5 N. Y. 256; *Gardner v. Ogden*, 22 N. Y. 343; *Scott v. Freeland*, 7 S. & M. 409; *Boyd v. Clements*, 14 Ga. 639; *Jewett v. Miller*, 10 N. Y. 402; *Fox v. Mackreth*, 1 Eq. Cas., (4 Am. Ed.) 240; *Slade v. Van Vechten*, 11 Paige 21; *Iddings v. Bruen*, 4 Sandf. Ch. 223; *Railroad Co. v. Howard*, 7 Wall. 392; *Torrey v. Bank of Orleans*, 9 Paige 664; *Mapps v. Sharpe*, 32 Ill. 14; Kerr on Fraud & Mist., 157.

2. This sale was also illegal because twelve out of thirteen of the directors, and the superintendent and the treasurer of the North Missouri Railroad Company were largely interested in the purchase. *Aberdeen R. R. Co. v. Blaikie*, 1 McQueen 461; *Cov. & Lex. R. R. Co. v. Bowler*, 9 Bush 468; *Port v. Russell*, 36 Ind. 60; *Bentley v. Craven*,

18 Beav. 75; *Great Lux. Ry. Co. v. Macquay*, 25 Beav. 586, 592; *York & Midland Ry. Co. v. Hudson*, 19 Eng. L. & Eq. 365; *Butts v. Woods*, 37 N. Y. 317; *Cumberland Coal Co. v. Sherman*, 30 Barb. 571, 188; *Kœhler v. B. R. F. Iron Co.*, 2 Black 715; *Jackson v. Ludeling*, 21 Wall. 616; *Richardson v. Jones*, 3 Gill & J. 184; *E. & N. A. Ry. Co. v. Poor*, 59 Me. 178; *H. S. C. Co. v. C. C. & I. Co.*, 16 Md. 456; *C. C. & I. Co. v. Sherman*, 20 Md. 117, 134; *Robinson v. Smith*, 3 Paige 222; *Verplanck v. M. Ins. Co.*, 1 Ed. Ch. 84; *Kerr on Fraud & Mist.*, p. 161; *C. C. & I. Co. v. Parish*, 42 Md. 598; *Keech v. Sanford*, 1 L. Eq. Cas. (4 Am. Ed.) 65; *Bliss v. Matteson*, 45 N. Y. 22; *Bedford R. R. Co. v. Bowser*, 48 Pa. St. 29; *Bayless v. Orne, Bybee et al.*, 1 Free. Ch. 161; *Hodges v. N. E. Screw Co.*, 1 R. I. 312; *Dodge v. Woolsey*, 18 How. 331, 345; *G. C. & S. R. R. Co. v. Kelly*, 77 Ill. 426; *Perry on Trusts*, § 207; *Chapin v. Weed*, Clark's Ch. 464; *Campbell v. Johnston*, 1 Sandf. Ch. 148; *McGill v. Schaeffer*, 7 Watts 412; *Bell v. Webb*, 2 Gill 164; *Evertson v. Tappen*, 5 John. Ch. 495, 513; *Bank of Orleans v. Torrey*, 7 Hill 260: *Van Epps v. Van Epps*, 9 Paige 238; *Fox v. Mackreth*, 1 L. C. in Eq. (4 Am. Ed.) 252.

3. The sale was illegal because the deed of trust under which it was made was illegal and void. This deed was executed by order of the board of directors in pursuance of a contract made by the board with the St. Louis & North Missouri Company, of which last company eleven out of thirteen of the directors, including the president and leading men on the board, were members, with a definite understanding that they should control the company. *Port v. Russell*, 36 Ind. 60; *Aberdeen R. R. Co. v. Blaikie*, 1 McQueen 461; *Cov. & Lex. R. R. Co. v. Bowler*, 9 Bush 468; *Butts v. Woods*, 37 N. Y. 317; *E. & N. A. R. R. v. Poor*, 59 Me. 278; *H. S. Coal Co. v. C. C. & I. Co.*, 16 Md. 456; *C. C. & I. Co. v. Sherman*, 20 Md. 117, 134; *Cumberland C. Co. v. Sherman*, 30 Barb. 571; *San Diego v. Railroad Co.*, 44 Cal. 104; *Perry on Trusts*, §§ 207, 602 w.

(a) The organization of a company or corporation by

the directors and trustees so as to contract with themselves through that agency and thus conceal their interest in the contract, like the employment of a third person as agent to buy for the benefit of the person under disability to purchase, adds an element of actual fraud to what otherwise might have been only constructively fraudulent. *Smith v. Isaac*, 12 Mo. 109; *Thornton v. Irwin*, 43 Mo. 153; *Michoud v. Girod*, 4 How. 503; *Abbott v. American Hard Rubber Co.*, 33 Barb. 578, 594; *James v. R. R. Co.*, 6 Wall. 752; *C. C. & I. Co. v. Sherman*, 20 Md. 117; *H. S. Coal Co. v. C. C. & I. Co.*, 16 Md. 456; *C. C. & I. Co. v. Sherman*, 30 Barb. 563.

(b)   The result is the same whether the St. Louis & North Missouri Company was composed entirely of directors of the North Missouri Railroad Company, or partly of directors and partly of others in partnership with them. Notice to one member of the firm that a breach of trust is being perpetrated in making the contract is notice to the firm.   A trustee cannot become qualified to contract with himself by taking a partner.   Perry on Trusts, § 205; *Paul v. Squib*, 12 Pa. St. 300; 2 Sug. on Vendors, (7 Am. Ed.) b. p. 887, note; Kerr on Fraud & Mist., p. 162; *ex parte Bunnell*, 9 Jur. 116; *Stephen v. Beall*, 22 Wall. 340; *Fox v. Mackreth*, 1 L. Eq. Cas. (4 Am. Ed.) 241; *Robbins v. Butler*, 24 Ill. 387; *Hawley v. Mancius*, 7 John. Ch. 185; *H. S. Coal Co. v. C. C. & I. Co.*, 16 Md. 456; *Mapps v. Sharpe*, 32 Ill. 1; *C. C. & I. Co. v. Sherman*, 20 Md. 117; *Sypher v. McHenry*, 18 Iowa 232; *Mitchum v. Mitchum*, 3 Dana 265; *C. & L. R. R. Co. v. Bowler*, 9 Bush 468.

4.   But this deed of trust under which the sale took place, was null and void for still another reason—The North Missouri Railroad Company did not owe the St. Louis & North Missouri Company anything when the $4,-000,000 second mortgage bonds were issued.   This last company was and still is largely indebted to the railroad company for $5,000,000 of full paid stock taken by it in the railroad company and never paid for.   It is plain that

if the St. Louis & North Missouri Company owed the railroad company $5,000,000 on account of stock taken, and then advanced $1,800,000 to complete the road and bridge, as their bonds to the State required, they still remain indebted to the railroad company $3,200,000, after crediting the amount advanced, and, therefore, that there could have been no consideration for the $4,000,000 bonds which the directors caused to be issued to themselves and partners.

(a) Directors have no power to issue full paid stock at less than par. All stockholders must be on perfect equality, and it is not only against public policy, but it is a fraud on other stockholders as well as creditors, to issue new stock at less than par value. Brice's Ultra Vires, (Am. Ed.) 153; *Sturgess v. Stetson*, 1 Biss. 246; *Neuse Riv. Nav. Co. v. Newburn*, 7 Jones' Law (N. C.) 275.

(b) Every stipulation made by directors with third parties, permitting stock to be taken on terms more favorable than other stockholders have had, is void. The subscription is valid, but the stipulation for discrimination among stockholders is inoperative. *Mann v. Cook*, 20 Conn. 178; *N. A. & S. R. R. Co. v. Fields*, 10 Ind. 187; *E. I. & C. R. R. Co. v. Posey*, 12 Ind. 363. The rule applies with peculiar force to cases where directors attempt to admit themselves as stockholders on terms of special favor. The same is true even when the papers executed at the time of the subscription show the kind of preference intended and attempt to make the terms a condition of the subscription. *P. & S. R. R. Co. v. Biggar*, 34 Pa. St. 459; *Graff v. P. & S. R. R. Co.*, 31 Pa. St. 498; *Minor v. Bank*, 1 Pet. 65; *Upton v. Tribilcock*, 91 U. S. 47; *La. & M. Plankroad Co. v. Mays*, 29 Mo. 64; *Swartout v. M. A. L. R. R. Co.*, 24 Mich. 390; *Mann v. Cook*, 20 Conn. 178; *U. M. R. R. Co. v. Eastman*, 3 N. H. 141; *Sanger v. Upton*, 91 U. S. 60; *Henry v. V. & A. R. R. Co.*, 17 Ohio 187; *Chandler v. Brown*, 77 Ill. 331; *Pacific R. R. Co. v. Seely*, 45 Mo. 217. The pretended agreement not to enforce the State's lien cannot serve as a consideration for the $4,000,000 bonds. That lien, when

it was assigned to Roe and others, who received it secretly for the directors with whom they were in partnership, i. e., for "The St. Louis & North Missouri Company"—became, as a lien, extinct—it could never be enforced. The agreement not to enforce it was worth nothing. When a trustee acquires a lien, such as an execution or deed of trust, against the trust property, it becomes forever incapable of enforcement. The trustee simply has an equitable claim to reimbursement out of the trust property. Story's Eq., § 1211; Perry. on Trusts, § 602; Story's Eq. Jur., § 1212; *Hill v. Frazier*, 22 Pa. St. 320; *Jamison v. Glascock*, 29 Mo. 191; *Hawley v. Mancius*, 7 John. Ch. 184; *Rogers v. Rogers*, Hopkins Ch. 515; *Lingle v. Hogan*, 45 Mo. 109; *McAllen v. Woodcock*, 60 Mo. 180; *Page v. Naglee*, 6 Cal. 241; *Harrison v. Mock*, 10 Ala. 185; *Boyd v. Hawkins*, 2 Dev. Eq. 215; *Harris' Estate*, 1 Grant's Cases 273; *Green v. Winter*, 1 John. Ch. 26; *Gillet v. Gillet*, 9 Wis. 194; *Quackenbush v. Leonard*, 9 Paige 334; Re Oakley 2 Ed. Ch. 478; *Port v. Russell*, 36 Ind. 65; *Critchfield v. Haynes*, 14 Ala. 49; *Gunter v. Janes*, 9 Cal. 643; *Jones v. Dawson*, 9 Ala. 672.

(c) Each of the foregoing objections derives additional force from being associated with all the others. The selling trustees were purchasers. Not only so, but they united in the purchase with the directors who were under a similar disability. Then they purchased under a deed of trust that they had illegally executed to secure bonds which they had issued to themselves while the railroad company not only did not owe them one dollar, but while they owed the company $3,200,000. Add to this the aggravating circumstances that these measures were planned and executed secretly—without the knowledge of outside stockholders, and for the purpose of individual gain—that these trusted men designed to accomplish the destruction of the corporation whose trustees they were, and to create a new corporation to own the road, for their benefit, and thus to make it " a profitable instead of a losing concern" —that they falsely put forward Jesup as the purchaser,

and then made him a deed, but still concealing their own interest in the purchase—and we have a case, not simply of constructive fraud—which without more would have vitiated the title—but a case of actual, conscious fraud without a parallel in that method of manipulating the affairs of corporations which the Supreme Court of the United States declares to be " a modern and wicked thing."

II.    The sale of the North Missouri Railroad by the United States marshal was illegal, null and void.

(a)    The secret agreement of the president, directors and trustees to buy up claims, get judgment against the road and sell it, was a corrupt agreement.    Kerr on Fraud & Mist., 157 ; Story's Eq., § 192.

(b)    The judgments when obtained were void, because they were not in the names of the real parties in interest. Wag. Stat., 999.    (c) Also, because they were fraudulently taken for too large an amount.    *Van Horne v. Fonda*, 5 John. Ch. 408 ; *Hawley v. Mancius*, 7 John. Ch. 187 ; *Lingle v. Nat. Ins. Co.*, 45 Mo. 109.    (d) Because the real parties in interest were directors and trustees who had no right to sue.    *Lingle v. Nat. Ins. Co.*, 45 Mo. 109 ; 2 Sug. on Vendors, (7 Ed.) 1036.    (e) The decree of court founded on the judgment was fraudulently obtained.    The court was deceived as to the real parties at interest, as to their disability to sue, as to the real object of the proceeding, and as to the good faith of the defense.    Kerr on Fraud & Mist., 42, 43 ; *Underwood v. McVeigh*, 23 Grat. 409; *C. & L. R. R. Co. v. Bowler*, 9 Bush 468, 507.    (f) The sale was void, because a previously acquired title, known to the purchasers only to be illegal, was held out as good, and thus all competition at the sale forestalled, and the property worth $15,000,000 bought for $45,000.    (g) Because the property was bid in in the name of the St. Louis, Kansas City & Northern Railway Company, which was an organization formed by the directors, trustees and their partners to hold the title for them, and they were under a disability to pur-

chase—" a total disability enjoined to take away all temptation."

This suit was also brought in time. It was almost brought prematurely—not before the frauds complained of were committed—but before, with the most untiring exertion, the chief grounds of complaint were known. Hence, the original petition contained no allegation as to combinations of the directors to sell out the railroad and to buy it themselves, nor of the fact that the trustees were purchasers, nor, in a word, of any of the purposes or acts of either " The St. Louis & North Missouri Company," nor of that culmination of fraud " The Illinois, Missouri & Kansas Association." All these vital allegations appear for the first time in the amended petition.

The fact that other parties may have bought stock in the St. Louis, Kansas City & Northern Railway Company is no reason why that company should hold property to which it has no title. *Mechanics Bank v. N. Y. & N. H. R. R. Co.*, 13 N. Y. 599; *R. R. Co. v. Howard*, 7 Wall. 393; *Sherwood v. M. V. M. Co.*, 50 Cal. 412. It cannot be maintained that Kitchen has cut off all his right to relief because he at one time owned stock in the St. L., K. C. & N. Ry. Co. (a) It was bought in his absence by his partner and without his knowledge and contrary to his known wishes. A man ratifies an unauthorized sale by accepting the proceeds, but it is only where he is allowed a choice, and it is the result of that choice that he ratifies anything. Kitchen's partner had a right to sell partnership stock, and there was no choice left him. But at most receiving the proceeds of a sale could only ratify that sale. (c) At the time Kitchen owned the stock in the St. L., K. C. & N. Ry. Co. he knew nothing of the breaches of trust alleged in the petition. *C. C. Co. v. Sherman*, 20 Md. 117; 3 Yerger 369; Ang. & Ames on Corp., § 517. (d) But Kitchen is only one of the plaintiffs. If he were estopped it would not affect other parties to the suit.

*James O. Broadhead* for respondent.

1.   There was no fraud in fact in the purchase of the road and its franchises, nor in any of the antecedent acts of the defendants in connection with the road, which led directly or indirectly to the sale.

2.   At the time of the making of the $4,000,000 of second mortgage bonds, and from that time forward, the stockholders had no equitable interest in the property, and no legal rights as shareholders except by the sufferance of the creditors, the road and other property being incumbered to an amount largely over its value.

3.   There being no fraud and nothing that could be the subject of a fraud so far as the stockholders are concerned, the whole transaction was a scheme formed by creditors and incumbrancers to secure their just and lawful claims.

4.   The plaintiffs in this suit having knowledge of the existence of the second mortgage, and of the advertisement for sale long before the sale took place, and of the steps taken to reorganize the company after the sale, will be presumed in law to have acquiesced in the sale, and that a court of equity will not, under the circumstances, jeopardize the interests of innocent parties who have acquired rights under the sale, by setting it aside.

5.   The court will not do a vain thing; and it appearing from the facts in the case that the debts of the company and the incumbrances upon the property were more than sufficient to absorb the whole of it, and that these debts must be paid out of the assets of the company as far as they will go, it would be unwise and inequitable at the instance of any number of stockholders to set the sale aside and restore the property to the corporation.

The act of the directors in issuing the bonds and making the second mortgage was not void, but at most voidable.   *Gaines v. Allen,* 58 Mo. 545 ; *McNees v. Swaney,*

50 Mo. 388; *Reddick v. Gressman*, 49 Mo. 389; *Thornton v. Irwin*, 43 Mo. 153; *Allen v. Ranson*, 44 Mo. 263; *Medsker v. Swaney*, 45 Mo. 273; *Reddick v. Gressman*, 49 Mo. 392; 1 White & Tudor's Lead. Cas., 217, 218; *Thorp v. Cullum*, 1 Gilman 615; Hill on Trustees, 159; *Ex parte Burnett*, 10 Ves. 393; *Ives v. Ashley*, 97 Mass. 198; *Blood and wife v. Hyman*, 13 Met. 236; *Jamison v. Hapgood*, 7 Pick. 1; *Litchfield v. Cudworth*, 15 Pick. 23; *Davoue v. Fanning*, 2 Johns. Ch. 271; *Hawley v. Cramer*, 4 Cowen 717; 1 Perry on Trusts, 249.

The records of the proceedings of the board of directors of the North Missouri Railroad show all the important steps taken by the company in reference to these transactions. The proceedings of the board of the 16th day of October, 1867, show what was due by the company in regard to the proposition of Eads and his associates of the date of October 7th, 1867; and so the records of the 19th day of November, 1868, show fully what was done by the board in regard to the proposition of May 6th, 1868, made by Roe and others, purchasers of the State lien, the acceptance of their proposition and the resolution of the board providing for the issue and delivery of the bonds and mortgage and stock mentioned in that proposition. There was no secrecy about it, and it was open to the inspection of any stockholder.

Kitchen, the plaintiff in this suit, whilst he was buying stock in the winter and spring of 1871, said that he knew of the second mortgage and believed it to be illegal, because the stockholders had not authorized it, but whether he knew of it or not, he, as a stockholder, had the means of knowing, and a court of equity will not permit him, or any other stockholder four years after the mortgage was made and two years after the sale has taken place under it, and after new interests had been acquired and new liabilities incurred, to impeach the validity of the sale. *Twin-lick Oil Co. v. Marbury*, 91 U. S. 591; *Graham v. B. & C. R. R.*, 20 Law Jour. (N. S.) Ch. 445; *Hodgson v. Earl of Powis*, 15

Jur. 1022; *Peabody v. Flint*, 6 Allen 52; *Samuel v. Holladay*, 1 Woolworth 415; *Follansbe v. Kilbreth*, 17 Ill. 522; *Jones v. Smith*, 33 Miss. 216; *Wade v. Pettibone*, 11 Ohio 57; *Tash v. Adams*, 10 Cush. 252.

*Glover & Shepley* for respondents.

The fact that the trustees of the mortgage under which the sale was made, owned bonds secured by the mortgage, and that it was bought at said sale by a combination of all these bondholders secured by that mortgage, does not invalidate the sale made by them, even if the attempt had been made to set it aside, while it was in the hands of the original purchasers. Neither is it any objection to the validity of a sale of a railroad under a mortgage, that part of the bonds secured by that mortgage happened to be owned by directors of the corporation.

But even if this were not so, the sale being voidable, and not void, if the mortgageor has a right to set it aside, that right must be exercised at once, and public policy and a just regard for private interests require that legal steps should at once be commenced for that purpose. A delay of almost two years, in commencing any action, is altogether unreasonable, especially in view of the fact that the property had been conveyed to another corporation, having duties to the public, and whose shares are constantly selling in the open market and its owners changing every day. The fact that any disturbance of the status of these large public corporations affects large and varied interests, and necessarily creates wide spread disaster among those who have no immediate connection with the company itself, calls for the most immediate action in setting aside a voidable sale.

In this case, the new corporation goes on and expends large moneys upon the property; makes new contracts with other roads; constructs new branches; makes new combinations. Think only of the amount of money over

and above the money received from the road itself, that was expended from the time of the sale to the time of the commencement of this suit, viz: $2,273,354.08. When we take into account how many persons have, in the management of every railroad, accounts of large magnitude outstanding with the company, and what losses will inevitably come if this sale should be set aside,' we see how necessary it is, for the public welfare as well as for private protection, that the utmost diligence should be used in the instituting of proceedings for setting the sale aside. If persons interested desire to do so, they must lose no time in informing themselves of their rights and asserting them in the courts. The consequences to public and private rights are too serious to admit of delay.

Nor does the fact as alleged, that the things set up here to invalidate this sale were not known till after the filing of this bill to the parties named as plaintiffs, help them in any degree. The knowledge of Kitchen is the knowledge of all, and his laches their laches, even if he stood here in no other guise than as a co-plaintiff. But he is really the sole plaintiff, the one for whose use the suit is prosecuted. Again. He not only knew that there was an arrangement whereby the holders of the old stock were allowed to receive stock in the new corporation, but 100 shares of the new stock was issued to him and he disposed of the same. Again. According to his own statement, from the time of the sale of the road under the second mortgage, he challenged its legality and insisted that it was invalid. We are not specially concerned with his reasons. It is sufficient that his attention was called to its alleged invalidity—and he must inform himself as to the reasons for the invalidity if he expects to have his rights preserved.

Besides, the defendant's title, by purchase under the decree of the United States circuit court, was perfect.

NORTON, J.—This cause was tried at the December term,

1874, of the St. Louis circuit court, resulting in the dismissal of complainants' bill and judgment for defendants. This judgment, on appeal to the general term, was affirmed, from which plaintiffs prosecute their appeal to this court.

The St. Louis, Kansas City & Northern Railway Company claim to have acquired title to all the property of the North Missouri Railroad Company, by virtue of a sale made by Humphreys and Vail, on the 26th day of August, 1871, as trustees, in what is called in the petition a second mortgage, and also by virtue of a sale made under a decree of the United States circuit court for the Eastern District of Missouri, at its April term, 1872, directing the sale of all the right, title and interest of the North Missouri Railroad Company, in and to the railroad constructed by it and known as the North Missouri Railroad. The title thus asserted is assailed by the plaintiffs on the ground of actual and constructive fraud, and we are called upon to say whether, in the light of the facts as disclosed by the evidence, either existed in the various and complicated transactions which preceded these sales and brought them about.

As precedent to the inquiry we are called upon to make, it may be well to observe that this suit is prosecuted by thirteen stockholders of the North Missouri Railroad Company, who claim to own in the aggregate 4080 shares. Mr. Kitchen, one of the plaintiffs, claims in his own right 727 of these shares, with an option, as shown by the evidence, to become the absolute owner of the remainder at $10 per share, as arranged between himself and his coplaintiffs, which arrangement was in existence at the time the suit was brought, and at the time it was tried. It may also be observed that the North Missouri Railroad Company was chartered by an act of the General Assembly of 1851, with a capital stock of $16,-000,000, $2,600,000 of which had been taken by counties and individuals, and had been paid and expended on the

road; that the State had loaned its credit to the road to the amount of $4,350,000, which had also been expended in the construction of the road between 1851 and 1865, and which was a first lien on said road. By an act of the General Assemby (Acts 1865, p. 90,) entitled "An act to provide for the completion of the North Missouri Railroad and its west branch, and for the construction of a bridge over the Missouri River," the company was authorized to issue $6,000,000 of first mortgage bonds, and the State's lien of $4,350,000 was postponed and converted into a second lien, and made entirely subordinate to the $6,000,-000 lien authorized by the act. The evidence shows that up to October 16th, 1867, $2,400,000 of the first mortgage bonds thus authorized had been sold, from which the sum of $2,055,920 had been realized and expended. The evidence of plaintiffs' own witnesses establishes the fact that the mortgage bonds remaining unsold could not be sold by Jay Cook & Co., (who were the agents for the sale of them,) at sixty-five cents on the dollar, and these bonds constituted the only source from which the North Missouri Railroad Company could realize money with which to prosecute its work; that the last sale made only realized to the company sixty-five cents.

The evidence shows that on the 7th day of October, 1867, articles of association were entered into for the purpose of purchasing the first mortgage bonds of the North Missouri Railroad Company, and ultimately, if found profitable to do so, to purchase said road; the capital stock was $2,000,000, and each member was to be interested in the adventure in the proportion that the sum set opposite his name should bear to the said $2,000,000. It was a further condition of said articles that the price to be paid for the bonds should not exceed $72\frac{1}{2}$ cents, and that, in the event of their purchase, the parties were to have control of the company. These articles were signed by E. D. Morgan & Co., R. L. Kennedy, A. Cotting, Charles K. Dickson, John R. Lionberger, John Jackson, Barton Bates,

Wm. M. McPherson, E. W. Fox, Jas. S. Rollins, J. A. Ubsdell, J. B. Eads, H. T. Blow, G. B. Allen, J. G. Copelin, J. H. Britton, John J. Roe, John Knapp. Three of the parties signing these articles, viz: Rollins, Britton and Fox, were directors of the North Missouri Railroad Company. The record book of the company offered in evidence shows that on the 16th day of October, 1867, it was resolved, in view of the financial condition of the company and the desire of the board to press the North Missouri road to completion, that the proposition of J. B. Eads, this day submitted to the company, be accepted. The proposition referred to in the resolution, as shown by the evidence of Eads, was to purchase $3,600,000 of the first mortgage bonds at $72\frac{1}{2}$ cents, less $3\frac{1}{2}$ per cent. commission, with the condition that Eads, who made it, should have the right to name seven directors out of thirteen.

It is insisted by the plaintiffs that this transaction is tainted with both actual and constructive fraud, that the actual fraud is evidenced by the statement made in the articles of association: "If it be found profitable to do so, ultimately to buy the road," and the condition contained therein that they were to have control of the North Missouri Railroad Company; that the constructive fraud is made to appear from the fact that three of the parties to this association, and who participated in the purchase of the bonds under the Eads proposition, were at the time directors of the North Missouri Railroad Company. In determining the question as to whether actual fraud entered into the purchase of these bonds, we have to be guided to our conclusions by the financial condition of the road at the time, the price paid, and all the attending circumstances which gave rise to it. Regarding the validity or invalidity of this transaction as a pivotal point in the case, it becomes necessary first to dispose of the question presented by it.

From the evidence of witnesses introduced by plaintiffs, it abundantly appears that in October, 1867, the North

Missouri road was in an incomplete condition, having been only constructed to Macon City, a distance of 167 miles; that there had been expended in such construction $2,502,-204.95 derived from stock subscriptions, $3,639,767, proceeds of the State loan, and $2,055,922, proceeds of the $2,400,000 of first mortgage bonds, and $126,296 from other sources, making an aggregate expenditure of $8,-324,188. Besides this expenditure, there was a floating debt of $400,000. Witness Arthur testified that he had been a civil engineer since 1839, had been engaged in constructing and operating railroads for twenty-five years, that he was perfectly familiar with the affairs of the road; that the road complete to Macon City was valueless as a railroad; it could not be operated except at a loss; it would not pay running expenses; it had no local business of any consequence, and the through business was cut off by the Chicago line at Macon. He further says that in October, 1867, it would have taken $4,108,600 to build and equip the road to the North Missouri Junction and to Coalesville on the State line. At that time the assets of the road consisted of $114,425. It was also shown by the evidence of Humphreys and Eads that the 167 miles of completed road had but little, if any, through business, and the country through which it passed did not afford way business sufficient for it to pay its expenses. The evidence also shows that it was incumbered with $2,400,000 of first mortgage bonds, with the lien of the State, then amounting to more than $6,000,000, and about $400,000 of floating debt. The stock of a road in such condition would, as testified to, seem to be without value. The first mortgage bonds, as testified to, could not be sold on the market except at a ruinous sacrifice. It was shown by Eads, who was introduced as a witness by plaintiffs, that in view of the probable failure of the enterprise, representations were made by him to eastern capitalists that the road could be completed with the proceeds of the sale of the first mortgage bonds, and when completed in its main line and branch, it would

become a paying road, and be a good security for the first mortgage bonds, that the object in forming the association to purchase the unsold bonds, was to aid the North Missouri road to completion, and, at the same time, to create property which would be a security for the investment made in the purchase of the bonds.   Capitalists were thus induced to invest their money in the purchase of these bonds and incur the hazard incident to such investment, and in the light of the facts above detailed, it is difficult to perceive the slightest taint of actual fraud in the purchase made.   The sale was open and fair, and the price paid was about ten per cent. more than such agents as Jay Cook & Co. were then able to get for them in the market.

Nor do we think, as is contended, that fraud is evinced either in the statement contained in the articles of associ-

1. RAILROAD COR- ation, that it was the object to purchase the
PORATION: man-
agement, not road ultimately if found profitable to do so,
fraudulent: di-
rectors interested or in the requirement that they should have
in corporate con-
tracts. the control of the company.   There is nothing inconsistent with the utmost good faith in either of these stipulations.   The last might well have been insisted on because the purchase of the bonds, if made, involved and would require millions of money, and the only security which could be relied upon to save harmless those who furnished it, would be a faithful and honest application of it to the completion and equipment of the road.   Hence, there was a propriety in the demand of these capitalists that they should have a controlling voice in the directory in order that the money furnished might be thus applied and result in giving them ample security for their investment in the bonds.   So in regard to the first stipulation, "to buy the road ultimately, if deemed profitable to do so," it may be said that there was nothing illegal or fraudulent in that alone, as we cannot presume and infer from it, that if they should purchase, they would purchase it in any other than in a lawful manner and under circumstances which would authorize them to buy.

It is, however, insisted and urged with great ability and much plausibility by counsel, that inasmuch as three of the eighteen persons who signed these articles were directors of the North Missouri Railroad Company, the sale of these bonds was a sale made to themselves, and it thereby became a constructive fraud, and the association should be treated as holding the $360,000 which it realized from the sale of the bonds more than it paid for them in trust for the North Missouri Railroad Company. If we look at the history given of this purchase by Eads, witness for the plaintiffs, it is not subject to the objection made. In answer to an inquiry propounded by plaintiffs, in what way were the bonds of the road purchased by that first association, he answered: "They were bought from the board of directors. It was at a regular meeting of the board that I made the proposition. It was an individual proposition, no body else was known in it but myself at the time. The board of directors had reason, I presume, to believe that I would carry out any agreement I made in the premises. I read the proposition before the meeting, I think about eleven o'clock in the morning, and it was a subject of discussion all day long with them, and it was after dark when they finally determined to accept it." On cross-examination this witness was asked the following question : When you thought of purchasing the bonds of the North Missouri Railroad Company, who made the proposition to said company with regard to purchasing? His answer was : "I made the proposition myself to the railroad company, and upon the assurance which I had of a few individuals that they would take an interest in the purchase. It was my own individual proposition; no body else was known in it but me, none of the gentlemen then knew who was backing me in it, excepting probably one director." He, in answer to a further question, answered that when the contract was made there were twelve or thirteen directors of the company who had no interest in it. " In fact, at that time there were only

four individuals that had a direct interest in my proposition, that were bound by it. All the others that afterwards came into it could have declined to take any interest whatever in it. I was led to believe that certain of them would take an interest in it verbally, from conversations I had with them; but they were under no obligation to do so."

J. S. Rollins, who was a director, and whose name appears to the articles of association, testified that the first he knew of the proposition made by Eads and others, was when it was made in writing and read to the directors, and that he observed "that this promises fair to complete this road. That is the object we have in view; we have tried it and failed; we have tried hard to sell these bonds; we have failed, and if these gentlemen can do what they say they can do, I think we ought to give way to them." J. H. Britton testified that Eads made a proposition to the board of directors to buy the unsold portion of the $6,-000,000 bonds, and that Eads at that time had no connection with the road, and that they were sold to him. He also testified, on re-examination, that he signed the articles of association and subscribed $83,333. It does not, therefore, appear that either Fox, Rollins or Britton had anything to do with the purchase of these bonds previous to or at the time of the acceptance of the proposition of Eads by the board of directors, but on the contrary, it does appear from the evidence that they were not interested. It, therefore, follows that the objection urged to this transaction is not supported by the facts.

But conceding that they were cognizant of and were interested in the purchase of the bonds at the time they were sold, it may be upheld under the authority of the following cases: *Buell v. Buckingham*, 16 Iowa 284; *Hartridge v. Rockwell*, R. M. Charlton 260; 6 Vert. 76; *Twinlick Oil Co. v. Marbury*, 1 Otto 587. In the case of *Buell v. Buckingham*, after a full review of the authorities, and a full recognition of the doctrine that the same person cannot act as the agent of the seller and become himself the

OCTOBER TERM, 1878.    245

Kitchen v. The St. Louis, Kansas City & Northern Railway Company.

buyer, a sale of all the corporate property by three direc-
tors to one of their number was upheld.

It clearly appears from the evidence that it was soon
ascertained that the proceeds of the sale of the first mort-
gage bonds would fall far short of being suf-
ficient to complete the road, and that to ac-
complish this end an additional expenditure
of $2,000,000 or more would be required; that the road
was incumbered with the first mortgage of $6,000,000, and
also with the lien of the State amounting in March, 1868,
to $6,238,000, besides its floating debt; that it would not be
able to meet the interest maturing the first of April, 1868,
on the first mortgage; that the enterprise was a failure,
and without some arrangements were made to relieve it of
its difficulties, it would go to sale under the first mortgage.
This condition of the affairs of the company was fully
recognized by the General Assembly in the passage of an
act, the first and second sections of which are as follows:

Section 1.    That the debt due, or to become due, from
the North Missouri Railroad Company to the State of Mis-
souri, for bonds of the State loaned said company to aid
in the construction of their road (amounting to $4,350,000),
and for interest paid on said bonds by the State, is hereby
sold and assigned to Henry T. Blow, John J. Roe, Gerard
B. Allen, John H. Beach, Solon Humphreys, Robert Lenox
Kennedy, and their associates, for the sum of $200,000,
which sum may be paid in any outstanding State bonds,
and shall be paid into the State treasury on or before the
4th day of July next.

Sec. 2.    Upon the payment into the State treasury,
within the time named, of said sum of $200,000, it shall
be the duty of the governor to transfer and assign to the
parties named, or the survivors of them and such of their
associates as they may request to be included, all the right,
title and claim of the State of Missouri against the North
Missouri Railroad Company on account of bonds loaned
by the State to said company, and interest paid by the

State on such bonds, together with the mortgage lien held by the State upon the road and appurtenances of said company; which transfer and assignment shall vest in said purchasers all the right, interest and claim now secured to or held by the State against said company, their road and appurtenances; provided, however, that before any transfer or assignment is made by the governor, as aforesaid, the parties purchasing, one or more of them, shall enter into bonds to the State of Missouri, with good and sufficient security, to be approved by the governor, in the sum of $500,000, conditioned that the parties to said bond, and their associates, shall furnish the necessary money to the North Missouri Railroad Company to enable said company to complete their road to the Iowa State line within nine months after the passage of this act, and to complete the west branch to a point opposite Kansas City within eighteen months after the passage of this act; and the evidence of such completion shall be the running of a train of cars, within the times named, to the points named; and the failure to complete either said road or branch within the times named, shall be conclusive evidence of failure to comply with conditions of the bond, and in such event the bond shall at once become due and payable, and if not paid, the payment shall be enforced at law by the attorney general, and the money, when collected, shall be paid into the sinking fund and be invested by the fund commissioner in the purchase of outstanding State bonds; provided, that if the North Missouri Railroad Company shall contract with the Kansas City & Cameron Railroad Company to run the west branch trains over the road of said last named company, from the point in Clay county where the roads come together, not exceeding eight miles from Kansas City, to the point opposite Kansas City, and shall so run the trains within the time named, the same shall be deemed a compliance with the conditions of the bond as to the west branch; and be it further provided, that before any transfer or assignment by the governor, aforesaid, is made to

the parties purchasing the claim of the State against the North Missouri Railroad Company, one or more of them shall also enter into bond to the State of Missouri, with good and sufficient security, to be approved by the governor, in the sum of $150,000, conditioned that the parties to said bond, and their associates, shall furnish the necessary money to the North Missouri Railroad Company to enable said company to build and complete, or cause to be built and completed, a railroad bridge across the Missouri River at the city of St. Charles, within three years after the passage of this act, and the evidence of such completion shall be the running of a train of cars and locomotive, within the time named, over said bridge; and a failure to so complete said bridge within the said three years, shall be conclusive evidence of failure to comply with the conditions of said bond, and, in said event, the bond shall at once become due and payable, and if not paid, payment shall be enforced, and the money, when collected, appropriated in like manner as provided for in relation to the other bond hereinbefore mentioned.

This act was passed on the 17th day of March, 1868, and on the 6th day of May, 1868, Roe, Allen, Humphreys and Kennedy, four of the persons named in the act, (the other two, Blow and Beach, declining subsequently to participate in the purchase,) submitted to the board of directors of the North Missouri Railroad Company a proposition in writing, as follows:

"*To the Board of Directors of the North Missouri Railroad Company:*

*Gentlemen*—The undersigned have considered the propositions made by some of the members of your board, verbally, and in reply have to say that they fully understand the wants of your company, and they agree with you as to the necessity that exists for the early completion of the west branch to Kansas City, and the main road to the Iowa State line; they also understand that a large sum

of money will be required to insure the completion. The undersigned are aware of the responsibility to be assumed in giving the bond to the State for the completion of the road and branch, and the bridge across the Missouri River, as required by the act of the General Assembly, entitled "An act to sell the claims of the State against the North Missouri Railroad Company, and to amend the charter of said company," approved March 17th, 1868. The financial condition and wants of your company have been explained to the undersigned, and further, that you have no securities or assets on which money could be raised in the market; that the present earnings of the road are entirely inadequate to pay interest on the $6,000,000 of first mortgage bonds heretofore issued and disposed of by the company. But as the undersigned, and their associates, are the holders of a large amount of the first mortgage bonds above mentioned, the value of which bonds will be greatly enhanced by the completion of the main road and branch, therefore, we propose for ourselves and associates, as follows: 1st. That we will furnish the necessary bonds to the State for the completion of the road and west branch, and the bridge across the Missouri River at St. Charles, as required by law. 2nd. That we and our associates will furnish the railroad company with the money necessary to complete the road and branch within the time required by law. 3rd. That we will provide the money to pay the coupons on the outstanding first mortgage bonds due in July and January next. 4th. That we will purchase the debt and lien now held by the State, as we are authorized to do by the law above referred to, which debt and interest amounts now to about $7,000,000, and will hold the same subject to the terms hereinafter stated; *Provided*, That the North Missouri Railroad Company will give us in payment for such advances, liabilities and assumptions, four millions of seven per cent. second mortgage bonds, to be dated October 1st, 1868, having twenty years to run, the interest payable semi-annually, free from Government tax, to be

secured by mortgage on main line, west branch, bridge stock and rolling stock, and also issue and deliver to us thirty thousand shares of the capital stock of said company, to be designated or known as main line stock, and twenty thousand shares of west branch stock. The bonds and stock to be issued *pro rata* to the undersigned and any associates they may have, according to the money advanced by them. And as a further consideration for the issue and delivery of said bonds and stock as aforesaid, the undersigned, when they obtain the assignment of the debt and lien, now held by the State as aforesaid, will enter into covenant with the North Missouri Railroad Company not to enforce the debt and lien held by them, so long as the right and title to the bonds and stock to be isued as aforesaid remain undisturbed in the holders, and the value thereof not impaired by heavy judgments against the company, if such should be obtained, in suits now pending against said company. Should this proposition be accepted the undersigned and associates will furnish the money as fast as needed for the rapid construction of said road and branch, and the money to pay interest when required. All which is respectfully submitted."

The records of the company offered in evidence show no entry as to the disposition made of this proposition till the 19th day of November, 1868, at which time, on motion of McPherson, a director, a resolution reciting the said proposition as made on the 6th day of May, 1868, also reciting that it was verbally understood that said proposition would be accepted by the board, but that said acceptance was not then formally made nor entered on the records, that said parties had complied with their proposition in part, and stood ready to comply in full, was adopted in the following words: " That the proposition of Roe, Allen, Humphreys and Kennedy is accepted, which acceptance is made now as of the date of said proposition to-wit: the 6th day of May, 1868, from which time the contract between the parties is declared to be full, complete and per-

fect." It was also resolved that the president, secretary and treasurer are directed to issue to said parties the bonds and mortgage and stock mentioned in said proposition, and that said parties, as holders of the lien of the State, unite in said mortgage for the purpose of waiving the priority of their said lien so as to give said mortgage precedence thereof, and also that the president, before delivering said bonds and stock, require and receive from them a covenant, in accordance with their proposition, that they will not enforce their said debt and lien acquired from the State except in the cases mentioned in said proposition. On the 29th day of May, 1868, a joint association styled the "St. Louis & North Missouri Company," was formed with a capital stock of $1,800,000, divided into 1800 shares of $1,000 each. The object of this association was to accomplish the completion of the North Missouri Railroad, the west branch and a bridge across the Missouri River at St. Charles, and, to this end, it was declared that the association would accept the proposition made by the State in the act of March 17th, 1868, and purchase from the State for the sum mentioned in said act its claim against the North Missouri Railroad Company, and comply with all the terms required by said act, by furnishing to the North Missouri Company the money necessary to complete the road to the Iowa line and the west branch to a point opposite Kansas City, and to build a bridge across the Missouri River at St. Charles, and to advance to said railroad company sufficient money to enable it to pay interest on its first mortgage bonds due on July 1st, 1868, and January 1st, 1869, and to secure from said North Missouri Railroad Company such issues of stock, bonds and other evidences of debt in payment of said claim to be purchased from the State, for the money to be advanced to complete said road and build said bridge, as will be a just compensation for said money and the use thereof.

On the 30th day of June, 1868, Allen, Humphreys, Roe and Kennedy, as principals, gave their bond to the

State in the sum of $500,000, as required by the act of March 17th, 1868. On the 5th day of December, 1868, Governor Fletcher issued his proclamation absolving the obligors from all liability on said bond, the conditions of it having been complied with in all respects. On the 13th day of June, 1868, Allen, Roe, Humphreys and Kennedy executed a writing, stating that the State lien was purchased by them for the persons who composed the joint stock company designated the St. Louis & North Missouri Company, so that each member of said association was interested in the same in the proportion that he was interested in said joint stock company. We have given thus fully all the details of the purchase of the State lien, of the proposition of Roe and others of May 6th, 1868, which culminated in the issuance of $4,000,000 second mortgage bonds, and 50,000 shares of stock, and the formation of the St. Louis & North Missouri association in order to an intelligible disposition of the objections made to them.

It is insisted by counsel that these various transactions are fraudulent, both in fact and in law, and cannot be upheld without breaking down and disregarding that salutary rule which forbids one who is acting in a fiduciary capacity from dealing with the trust property confided to his care for his own advantage or profit; that the issue of $4,000,-000 of bonds and $5,000,000 of stock was without consideration and void; and that in accepting the proposition of Roe, Allen and others, and in the issuance of bonds and stock they were contracting with themselves.

We are not able to perceive any ground for the proposition that any of these transactions are stained with actual fraud. The evidence indisputably shows that in March, 1868, the North Missouri Company was in extremely embarrassed circumstances, that it owed more than it could pay, that it could not be operated with success in its incomplete condition, that being incumbered with its first mortgage lien, the lien of the State and its floating debt, aggregating about $13,000,000, it could not possibly offer

any security for further advancements of money; that it would default in the payment of its interest falling due on the 1st day of April, 1868, and would be liable to sale on account of such default; that it would require an expenditure of about $2,000,000 to complete the road to its terminal points and pay its rapidly maturing interest. This being the condition of affairs, the act of March 17th, 1868, was passed, whereby the State agreed to sell its lien of nearly $7,000,000 for $200,000, thus making a legislative declaration that the road, in its then condition, was worth only $200,000 more than the first mortgage incumbrance. If it had been the fraudulent purpose of the defendants to own the road without regard to the interests of the stockholders, as charged by plaintiffs, an opportunity was here afforded, because they could have declined to accept the proposition made by the State, allowed a default to have taken place in the payment of interest, and thus brought the road to sale under the first mortgage. It does not appear from the evidence that any stockholder stepped forward in this emergency to relieve the company of its embarrassment, but, on the contrary, it does appear that capitalists, who had invested their means in the first mortgage bonds, were willing to come forward and incur new liabilities by the advancement of large sums of money to complete the work and to make the road what all seemed to desire to make it.

To enable the persons named in the act of the General Assembly to comply with its conditions, it was necessary that about $2,000,000 should be furnished to the North Missouri Railroad Company. If it had been furnished, accepted and used by the company without such an arrangement as was made on the 6th day of May, 1868, the right of those furnishing it to have enforced it as a lawful demand against the corporation, cannot, we think, be questioned. Nor could the right of the purchasers and owners of the State lien to enforce it have been questioned In our opinion the issue of the second mortgage bonds of

the company and $5,000,000 of stock are supported by a sufficient consideration. Under the proposition Roe and associates were to furnish $1,800,000 in cash, and relinquish the State lien held by them amounting to $7,000,000, and incur the responsibilities attaching to a $500,000 bond to be executed to the State. We are forced to the conclusion that in the powerless condition of the company financially, the arrangement entered into between the company and Roe and Allen, and their associates, on the 6th day of May, 1868, was not only free from actual fraud, but was dictated by the necessities of the case and from a desire to complete a great artery of commerce for the transportation of persons and property. It is evident that those who were intrusted with the management of the State lien had this view of it in the passage of the act of March 17th, 1868, which was intended to induce capitalists to complete a road to which it was unwilling further to contribute, and to infuse life into an enterprise which was then lifeless.

But it is insisted that although actual fraud may not be found, still the transaction is corrupted with constructive fraud, because some of the persons making the proposition of May 6th, 1868, were at the time directors, and because others afterwards signed the articles of association forming the St. Louis & North Missouri Company on the 29th day of May, 1868, and that they were, therefore, contracting for themselves. The record in evidence shows that on the 6th day of May, when the proposition of Roe, Allen, Humphreys and Kennedy was made, none of them were connected with the North Missouri Railroad Company in a fiduciary capacity. It, however, does show that Bates, Dickson, Copelin, Rollins and Britton, all of whom were directors of said company, became parties to the St. Louis & North Missouri Company by afterwards signing the articles of association on the 29th day of May, 1868, under which said company came into existence. It does not appear that at the time Roe, Allen, Humphreys and Kennedy made the proposition of the 6th day of May,

1868, these directors had any interest therein, or that there was any agreement by which they were to become interested.

Viewing the transaction as one under which the North Missouri Railroad Company was to receive sufficient money to complete the road, as therein stipulated, and pay the interest on the first mortgage bonds, and save the road from sale, we have the highest authority for saying that it was not void as is contended by plaintiffs. In the case of the *Twin-lick Oil Co. v. Marbury*, 1 Otto 588, which is a recently and thoroughly considered case, the court, after recognizing to the fullest extent that a director of a corporation, occupying a fiduciary relation in his dealings with the subject matter of his trust or agency, and with the beneficiary whose property is confided to his care, is viewed with jealousy, and that his acts may be set aside on slight grounds, declares "that the general doctrine in regard to contracts of this class is not that they are absolutely void, but that they are voidable on the election of the party whose interest has been so represented by the party claiming under it. While it is true that a director of a corporation is bound by all those rules of conscientious fairness which courts of equity have imposed as guides for dealing in such cases, it cannot be maintained that any rule forbids one director among several from loaning money to the corporation, when the money is needed and the transaction is open and otherwise free from blame.     *     *     No adjudged case has gone so far as this. Such a doctrine, while it would afford but little protection to the corporation against actual fraud, would deprive it of the aid of those most interested in giving aid and best qualified to judge of the necessity of that aid, and the extent to which it might be given." The same doctrine was, in the strongest terms, announced in Judge Ryland's opinion in the case of the *City and County of St. Louis, v. Alexander*, 23 Mo. 528, and the authorities cited, upon which the opinion is based. Applying the principles of these cases to the one

at bar, the mere fact that one or more of the parties proposing to advance money to complete the road were directors (there being thirteen) to whom the proposition was made, and by whom it was accepted, does not vitiate and render it void.

Nor are we able to perceive anything in the circumstances attending the transaction which puts upon it the stamp of unfairness, fraud or oppression, but on the contrary, much to commend what was done. The State, deeply interested in the completion of one of its most important railroads, which it had inaugurated by its charter in 1851, and for the construction of which it had incurred a very large debt, and being unwilling to add further liability, by the act of March 17th, 1868, invited the six persons named in the act to risk their credit and capital in the construction of the road, and, as inducement for their acceptance of the invitation, gave them the lien of the State for $200,-000. But four of the six named were willing to accept the proposition, and, as it involved a large expenditure of money, which could only be commanded by an association of men of capital, it was but reasonable and honest that they should first know what security would be given by the board of directors for such expenditure before soliciting capitalists· to join them in an association binding themselves to furnish the required means. It is clearly and indisputably shown by the evidence offered by complainants, that it would require nearly $2,000,000 to complete the road, that the company was wholly without resources to raise a single dollar with which to prosecute its work, that it would default in the payment of interest due in April, and be liable to be sold out. This condition of things gave origin to the passage of the act of March 17th, 1868, to the proposition made to the board of directors on the 6th day of May, 1868, and the formation of the St. Louis & North Missouri association on the 29th day of May, 1868. We are, therefore, of opinion that the directors in accepting the proffered advancement of money and

proposed suspension of the State lien, and in giving the required security, were acting for the best interests of the stockholders and creditors of the road, and that but for such acceptance a speedy sale of the road, involving an utter obliteration of the rights of all the stockholders, under their first mortgage, would have been the result.

Besides this, the action of the board in issuing the $4,000,000 bonds was reported on the 5th day of April, 1869, to the stockholders. In this report among the liabilities are mentioned first mortgage bonds $6,000,000, second mortgage bonds $4,000,000. It is also said that the debt for the State lien is held by private persons under an agreement that it shall not be enforced except upon a contingency not likely to occur, and it is not reported as a liability. Notwithstanding the report made to the stockholders, notwithstanding the openness and the notoriety of the transactions now made the subject of condemnation, a public law being the foundation for them, the stockholders offer no word of complaint, offer no aid, but see others expend millions of money in good faith, and after an acquiescence of five years seek to impeach what was so notoriously done, and what we have a right to presume they knew was being done. Not having spoken when they ought and should have spoken, they ought not to be heard to speak when they would.

It also appears from the evidence in the case that after the completion of the road to its terminal points, other

3. INSOLVENT CORPORATION: creditors may combine for self-protection without fraud.

large expenditures of money were required to equip it with rolling stock, in founding depots and furnishing other facilities in Kansas City in order to form connections with roads centering at that point, and in providing like facilities in St. Louis. To meet these requirements third mortgage bonds to the amount of $5,000,000 were issued. The evidence also shows that the road was operated with loss, and that in 1871 the floating debt had increased to more than $2,000,000, and that the road defaulted in the payment of its

interest on the second mortgage bonds; and that, in the spring of 1871, Morgan and Low, two owners of fifty of said bonds notified Humphreys and Vail, the trustees in the second mortgage, to proceed and sell the road under the power conferred in said mortgage. The trustees, in conformity with the notice, advertised said road for sale in the city of St. Louis on the 26th day of August, 1871. It also shows that on the 13th day of August, 1871, the association mentioned in the petition, styled the Illinois, Missouri & Kansas association was formed. The parties of the first part to these articles consisted of certain persons representing the owners of a majority of the stock, the second and third mortgage bonds and the debt of the North Missouri Railroad Company. The parties of the second part consisted of the persons interested in the Kansas Pacific Railroad Company, the Chicago & Alton and Pennsylvania Companies. Its capital stock was $5,855,000, of which $3,515,000 was subscribed by the parties of the first part, and the remainder by parties of the second part. The object of the association, as expressed, was to make provision whereby harmony of action should take place, and fair and just running arrangements for interchange of business and trade; in other words, to make the North Missouri road a trunk line with eastern and western connections. It was a part of the agreement that the association was to become the owner of the North Missouri road at a cost not to exceed $12,000,000. It was also agreed to protect their interest by a purchase of said road through a sale under the second mortgage, and in case said road failed to pay its floating debt, to procure judgment and effect the sale of so much of the road under said judgment as was not embraced in the second mortgage. This agreement contemplated the reorganization of the North Missouri Railroad Company on the basis of 120,000 shares of preferred, and 120,000 shares of common stock at $100 per share, limiting the capital stock to $24,000,000. In the articles the running arrangements made with the Chi-

17—69

cago & Alton, Kansas Pacific and Pennsylvania Companies are specifically set forth. The object and effect of these arrangements was to form a through line for all kinds of freight and passenger business between the cities of Boston, New York, Philadelphia, Baltimore and all other eastern points and all western points. The Illinois, Missouri & Kansas association, through M. K. Jessup, became the purchaser at the sale of the North Missouri Railroad made by the trustees, Humphreys and Vail, on the 26th day of August, 1871, at and for the sum of $2,000,000 for the road, and $87,000 for bridge stock. It is contended by counsel that this sale was the result of fraudulent combination and conspiracy, and that it is also constructively fraudulent and void because Humphreys and Vail, the trustees, being members of and subscribers to the articles of association of the Illinois, Missouri & Kansas association, were purchasers at a sale made by themselves. A careful review of the evidence has impressed us with the belief that the Illinois, Missouri & Kansas association originated out of the necessities of the case, and not from corrupt combination, conspiracy or motive. The evidence shows that from December, 1868, to the 1st day of January, 1870, the expenditures of the road amounted to $1,303,967.84, $913,078 of which was for construction, and that during that time there was a loss of $55,853 in operating the road, and a large increase in its floating debt; that from the 1st day of January, 1870, to the 21st day of August, 1871, the time of the sale, the amount of money used in construction, repairs, operating expenses, &c., was $6,133,804.29, and during that time there was received from earnings and all other sources $4,301,639, and that in May of 1871 the floating debt was $2,680,000; that notwithstanding the road was completed and equipped, it was a failure as a paying enterprise, and would continue to remain so unless running arrangements could be made with roads east and west of it; that a sale of the road was inevitable, either on judgments procured on the floating

debt of the company, or under its first or second mortgage; that in consequence of this state of things the interest of the creditors of the road and holders of its bonds were brought into great peril, and, to save themselves from impending loss, and to protect interests thus endangered, negotiations were entered into with the Chicago & Alton, Kansas Pacific and Pennsylvania railroads for the purpose of buying the road at the sale then advertised, and reorganizing it on such running arrangements as would save those who had invested their money in it from loss. These negotiations, which began in the spring of 1871, culminated in the full organization of the Illinois, Missouri & Kansas association in August, 1871. Such a combination was but the natural result of this state of affairs, and a large number of other persons than those who were connected with the St. Louis & North Missouri association, or the association formed to purchase the first mortgage bonds, subscribed between two and three millions of dollars to the said Illinois, Missouri & Kansas association. We cannot perceive in the evidence anything to justify us in the conclusion that this combination or association was prompted by corrupt motives or attended with actual fraud. Nor can we consent to say that the creditors of a corporation cannot combine for the purpose of protecting themselves by purchasing its property when legally brought to sale, provided it is no part of the agreement to prevent competition at the sale, or to use any unfair advantage.

It is, however, said that Humphreys and Vail, the trustees who made the sale, sold the property to the Illinois, Missouri & Kansas association in which they were interested as stockholders, and that, therefore, the sale is void. The evidence shows that Humphreys was a member of the copartnership of E. D. Morgan & Co., which firm had a two-thirds interest in the $540,000 subscribed by said firm to said association, and he was, therefore, interested to the extent of his interest in the copartnership. The evidence also shows that Vail, the other trustee, was

a subscriber to said association in the sum of $150,000. To this extent Humphreys and Vail were both sellers and buyers. The rule in such cases has been laid down in *Allen v. Ranson et al.*, 44 Mo. 267, thus : It is well settled that a mortgagee, with a power of sale, is a trustee as well as a creditor, and that at his own sale he cannot become a purchaser either directly or indirectly, so as to cut off the equity of redemption. But such a sale is not void; it is good as to all the world and for all purposes, excepting only that the mortgageor still has the right to pay the debt and redeem the land. Purchases by some classes of trustees are treated as void, but not in sales of this kind. *Gaines v. Allen*, 58 Mo. 543, asserts the same doctrine. In the case of *Reddick v. Gressman*, 49 Mo. 392, Judge Wagner observes: "The doctrine is that a mortgagee with a power of sale, is a trustee as well as a creditor, and that at his own sale he cannot become the purchaser directly or indirectly, so as to cut off the equity of redemption. But such a sale is not absolutely and entirely void. It is good as to everybody and for all purposes, except that the mortgageor still has the right to pay the debt and to redeem the land. Such sales are never regarded as nullities, and with the exception above stated, they are entirely good." The same doctrine is announced in *Thornton v. Irwin et al.*, 43 Mo. 153.

The rule thus laid down was applied to cases where the seller and buyer were united in the same person, and is distinguishable from the case before us in this, that Humphreys and Vail were only interested in the Illinois, Missouri & Kansas association in the proportion that $170,-000 bears to $5,855,000, that is one thirty-fourth part, the remaining thirty-three parts belonging to others who were creditors and owners of the second mortgage bonds, for the payment of which the road was sold. But, casting that out of view and regarding the sale as if it had been made solely to Humphreys and Vail, under the rule in regard to such sales, as settled in this State, the plaintiffs

would be restricted to their right to redeem, and this must be exercised within a reasonable time and before the intervention of new equities. It is contended by these plaintiffs that Humphreys and Vail were mere naked trustees, and being interested in the purchase, that the sale of August 26th, 1871, is void. In the case of *Hawley v. Cramer*, 4 Cow. 717, Justice Walworth, in speaking of purchases made by persons standing in the situation of trustees for the sale, observes that in all such cases the rule appears to be settled that the purchase, however fair and honest it may have been, must be set aside on the application of any of the parties in interest, provided such application is made within a reasonable time after the sale, which is to be judged of by the court under all the circumstances of the case. In the case of the *Cumberland Coal Co. v. Sherman*, 30 Barb. 563, the court held "that when a trustee buys or contracts with himself or several trustees of whom he is one, or a board of trustees, of which he is one, such contract or purchase is voidable at the option of the *cestui que trust* without reference to the fairness of the transaction." In *Campbell v. Walker*, 5 Ves. 678, the master of the rolls said: "I will lay down the rule as broad as this, and I wish trustees to understand it, that any trustee purchasing trust property is liable to have it set aside, if in any reasonable time the *cestui que trust* chooses to say he is not satisfied."

If, under the rule governing in such cases, plaintiffs had the right to come into court with a bill to redeem, or ask that the sale be set aside and a re-sale ordered, the question arises, have they deprived themselves of that relief, either by acquiescence, ratification or delay in not coming earlier? This suit was instituted on the 7th day of July, 1873, and the amended petition on which the case was tried was filed December 14th 1874. The second mortgage, under which the sale took place, was executed in 1868, and the sale complained of was made August 27th, 1871. The evidence shows that the sale was ratified and approved by

the directors of the North Missouri company in turning over the property to the purchaser at the sale; that 66,000 shares, or about seventeen-eighteenths of the stock was held by the association, which, of course, ratified it to that extent, that it owned the second and third mortgage bonds, and also the large floating debt of the company. It is, however, claimed that such ratification is not binding on plaintiffs, for the reason that the directors, as well as the owners of the 66,000 shares, were interested as purchasers.

While we think this is the correct view, and that such ratification is not binding on the holders of the 4080 shares of stock represented in this suit, yet all are of the opinion that the ratification is good as to those assenting to the sale. But the evidence, we think, shows ratification on the part of Mr. Kitchen, the real plaintiff as to 727 of the shares in this suit, and the beneficial plaintiff as to the remainder. Mr. Kitchen swears that he was present at the sale on August 26th, 1871, that he believed the mortgage under which the sale was being had, was illegal; that he sought no information from Humphreys and Vail, the trustees charged with the duty of selling the property, that he did not believe they were honest men. It does not appear that he interposed any objection to the proceedings. It does appear that, after the sale was made to Jessup for the Illinois, Missouri & Kansas association, and after Jessup had conveyed the property to the St. Louis, Kansas City & Northern Railway Company, a corporation formed under the general law of the State with a capital stock of 120,000 shares at $100 each, or $12,000,000 preferred stock and 120,000 shares of common stock at $100 each. Mr. Kitchen received a certificate of stock for 100 shares in the St. Louis, Kansas City & Northern Railway Company, which was given to him in exchange for a half interest held by himself and Bogy in 2000 shares of stock in the North Missouri Railroad Company. It also appears that he sold said stock at seventy-five cents on the dollar, and transferred it the same day he received it. It would,

therefore, seem that he became a stockholder in the company which he is now seeking to destroy by asking this court to declare the purchase, through which he obtained this stock, fraudulent and void, and that after having sold his stock thus acquired presumably to an innocent purchaser. It is true that he claims to have accepted this stock because the transaction was made by Mr. Bogy, who was equally interested, but he admits at the same time that he had agreed with Mr. Rollins to let all of his stock thus jointly owned by Bogy and himself in the North Missouri Railroad Company, as well as the 727 shares which he held in his own right go into the new organization. Kitchen swears that he believed that the second mortgage under which the sale was made to the Illinois, Missouri & Kansas association was illegal and void. When this fact is considered in connection with the fact that he afterwards, in exchange for the partnership stock held by Bogy and himself in the North Missouri road, accepted and sold for $7,500 100 shares of stock in the St. Louis, Kansas City & Northern Railway, which acquired its title through that sale, and that he acquiesced in the sale for nearly two years before bringing suit, we are not able to perceive upon what equitable principle he can now be heard to complain and allowed to assail a transaction which he has thus sanctioned, and out of which he has thus made profit, especially when its effect would be to destroy the value of the stock he sold and leave him in possession of what he received for it.

Besides this, the evidence shows that the second mortgage, under which the sale was had, was made in 1868, that the four million of bonds secured by it were reported to a stockholders' meeting in 1869 as a liability of the road; that from the time of their issue other parties were expending large sums of money in completing the road on the faith of the validity of the mortgage and bonds; that Kitchen took no steps to arrest these proceedings which he swears he believed to be illegal, for nearly five years

after the mortgage was executed. It also shows that he saw the advertisement for the sale of the road under the mortgage; that during its pendency he purchased one-third of his 727 shares of stock at from five to ten dollars per share; that he was present at the sale, made no effort to arrest it, afterwards became a stockholder in the St. Louis, Kansas City & Northern Railway; that no steps were taken by him to set it aside for nearly two years after it occurred, during which time 62,000 of the 120,000 shares of stock of the St. Louis, Kansas City & Northern Railway Company had passed into the hands of innocent holders, and very large expenditures of money made on the betterments of the road, thus giving origin to equal, if not superior equities to his own. While a *cestui que trust* has a right to come into a court of equity and ask that a sale of trust property made by a trustee to himself be set aside, his coming must be timely; he has no right to lie idly by until new equities arise, and speculate on the success or non-success of the investment or transaction of which he complains and see others, in good faith and without fraud, by a vast expenditure of money, make that valuable which was before valueless, and then come and ask the aid of the chancellor to enable him to appropriate to himself such benefits and advantages. We think this doctrine is firmly established by the following authorities: *Twin-lick Oil Co. v. Marbury*, 91 U. S. 591; *Samuel v. Holladay*, 1 Woolworth 415. Kerr on Fraud, p. 302; *Follansbe v. Kilbreth*, 17 Ill. 522; *Jones v. Smith*, 33 Miss. 216; *Wade v. Pettibone*, 11 Ohio 57; *Tash v. Adams*, 10 Cush. 252; *Hodgson v. Earl Powis*, 15 Jur. 1022; *Peabody v. Flint*, 6 Allen 52; *Graham v. Birkenhead & Cheshire R. R. Co.*, 20 Law Jour. (N. S.) Ch. 445. In the case of *Graham v. Birkenhead & Cheshire R. R. Co.*, 2 McNaughton & Gordon 156, it was held that where stockholders acquiesced for eighteen months, having had the means of knowing the acts complained of, " by not coming earlier they had precluded themselves from asking for the exercise of the extraordinary jurisdiction of

the court." The doctrine as recognized in the above cases is that the option to avoid such a sale as is here complained of must be exercised in a reasonable time, and unless so exercised equitable relief will be denied, especially when new rights, interests and equities have arisen and the parties cannot be restored to their original position.

It is, however, said that this doctrine cannot be applied in this case, because plaintiffs had no knowledge of the fraud complained of. Kitchen admits his knowledge of the execution of the mortgage and his belief that it was wrongful and illegal. The execution of the mortgage was not a secret. On the contrary, the records of the company show the fact of its execution, also the circumstances under which it was issued, and also the sale of the first mortgage bonds. The sale of the State lien to the parties named in the act of 1868 was made by a public law, and the conditions of it must or should have been known by all the stockholders. Kitchen was present at the sale complained of, and declined to make inquiries of the trustees whom he saw making the sale, for information in regard to it, but on the contrary, closed his eyes upon light. Such ignorance might well be imputed to him as knowledge, the rule being that there must either be knowledge or the means of knowing the illegal act complained of before a party can be barred by acquiescence. He having the means of ascertaining everything relating to the sale and purchase of the road, chose to remain in ignorance rather than to avail himself of the means at hand, and such ignorance may well be imputed to him as actual knowledge. In *Le Neve v. Le Neve*, 2 Lead. Cases Eq. 21, the law is stated to be " whatever is sufficient to put a person on inquiry is notice; that is, when a man has sufficient information to lead him to a fact, he shall be deemed cognizant of it." The law imputes to a purchaser the knowledge of a fact of which the exercise of common prudence and ordinary diligence must have apprised him. *Stephenson v. Smith*, 5 Mo. 617.

Besides this, it is indisputably established that he did know after the sale that the property had passed under the control of the St. Louis, Kansas City & Northern Railway Company, of which company he accepted stock in lieu of the stock held by Bogy and himself, which he converted into cash, and we think the language of the chancellor in the case of *Hodgson v. The Earl Powis, supra,* where the directors violated their authority under the act of Parliament, the period of twelve months having elapsed before suit, might well be applied in this case. He observed, "the plaintiff comes here with a very doubtful equity, and I am disposed to think if the equity were clear greater mischief would be done by granting than refusing the injunction." The evidence not only shows that Kitchen bought much of his stock during the pendency of the advertisement; that his co-plaintiff did also the same thing, a considerable portion being bought at from $3 to $5 per share, and before the institution of this suit all the co-plaintiffs had agreed to sell their stock to Kitchen at $10 per share, and that it was placed in what is called a safe deposit company in New York, and was to be withdrawn by Kitchen as his from said company on the payment of $10 per share. It would, therefore, seem that Kitchen had obtained an interest in the stock of his co-plaintiffs when this suit was brought, and to the extent of it the suit was prosecuted for his benefit, and that what binds him also binds them, especially in view of what is shown by the evidence of his co-plaintiffs, from which it appears that nearly all of them became possessed of the knowledge of the facts on which the suit is based soon after the said sale.

Ligget, one of the plaintiffs, testifies that he bought in his own right 600 shares of stock, 500 of them in May and 100 in September, 1871, and was interested as a member of the firm of Whitehouse & Co., also plaintiffs, in 300 other shares purchased in 1871; testifies that the facts and circumstances attending the sale came to his knowledge from thirty to sixty days after the sale, also that he knew

of the existence of the second mortgage a year or two before the sale; read the advertisement of the sale two weeks before it occurred, knew that Jessup bought the road, and about six weeks afterwards, learned about the formation of the new company, and knew of the incumbrances on the road.   Phippard, another member of the firm of Whitehouse & Co., which company negotiated for nearly all the stock represented in this suit, testifies that the existence of the Illinois, Missouri & Kansas association and the St. Louis & North Missouri association was well known within three months after the sale, and that he derived the information from Mr. Kitchen.   Dwight Roberts, another plaintiff, testifies that he bought 903 shares between January and April, 1871, saw the advertisement of the sale one month before the sale, made no inquiries of Humphreys and Vail in regard thereto, although they were residents of New York where he lived.   When asked from whom he derived the information of the facts on which the suit was brought, his answer was that he guessed he knew it himself; that he had an agreement with Kitchen to let him have his stock at $10 per share.   Bramard testified he bought 100 shares of stock, before the sale, of Whitehouse & Co., in whose hands it was left; that it was not in his own name.   Gibson testified he bought 200 shares between March and May, 1871; received the information in the fall of 1871 or spring of 1872, on which suit was brought. Sibert, of the firm of Speyer & Co., testified he bought 100 shares through Whitehouse & Co., and swears he did not know he was plaintiff in the suit till he testified.   Rowell bought 50 shares of stock April 13th, 1871, and derived information from Roberts, his co-plaintiff, in one or six months after he bought his stock of the facts in regard to the suit.   Hays, member of the firm of Glosson & Hays, testifies that they bought July 22nd, 1871, 300 shares of stock, and that he was informed by Phippard, co-plaintiff, the following year that they had been defrauded out of

their stock by the directors.    All testify that the stock was bought on speculation.

It thus appears that the plaintiffs owning nearly all the stock in suit who testified in the case, had actual knowledge within a short time after the sale, of the facts which induced the institution of the suit, yet the suit was delayed for nearly two years.    During this interval of time the St. Louis, Kansas City & Northern Railway Company was chartered under the general laws of the State, and from the notoriety of the facts that it immediately afterwards took possession of the North Missouri road, controlled, operated and expended money on it, we are authorized to infer that the plaintiffs had knowledge of these facts.    During this interval 62,000 of the 120,000 of preferred stock in the St. Louis, Kansas City & Northern Railway Company had passed, so far as the evidence shows, into the hands of innocent holders in no way connected either with the North Missouri road, or the St. Louis & North Missouri or the Illinois, Missouri & Kansas association, none of whom are parties to this suit except so far as they are represented by the St. Louis, Kansas City & Northern Railway Company.    That delay under these circumstances is obnoxious to the equitable principle which requires that an option to set aside such transactions as are complained of must be exercised within a reasonable time, when new rights and equities have intervened.

In the case of the *Twin-lick Oil Co. v. Marbury, supra,* the court held that " in this class of cases the party is bound to act, with reasonable diligence as soon as the fraud is discovered, or his right to rescind is gone.    No delay for the purpose of enabling the defrauded to speculate upon the chances which the future may give him of deciding profitably to himself whether he will abide by the bargain or rescind it, is allowed in a court of equity." In the case of *Graham v. B. & C. R. R. Co., supra,* where the shareholder remained passive for eighteen months, the

chancellor said : " Was it not the duty of those who meant to dispute the act to make an application at once to a court of equity to set it aside ?  It seems to me the moment the fact came to the knowledge of any individual member of the company he ought to have made an application to stop them, and the question is, whether by not doing so he has not given rise to a new equity against himself which deprives him of the right to prevent the company from doing that which was contrary to the right which the shareholders had.  This is the rule between the parties.  If those who have the management of the affairs of others depart from the regular course, and there is an acquiescence, the parties interested who have so acquiesced cannot complain of their conduct in that mode of dealing with their affairs.  I consider that the parties have precluded themselves from coming into a court of equity to ask for the exercise of its jurisdiction by injunction, by the course which they have pursued in not coming earlier." The principle here announced is, we think, applicable to the case we are considering.

The title of the St. Louis, Kansas City & Northern Railway Company to the property of the North Missouri, acquired by virtue of a sale made in September, 1872, under a decree of the circuit court of the United States for the Eastern District of Missouri, is also assailed by plaintiffs on the ground of fraud.  The said decree was made in a proceeding instituted by William Hoge, a judgment creditor, as plaintiff, against the North Missouri Railroad Company and nine judgment creditors of said company, some of which judgments were rendered in the State and others in the Federal courts, the whole aggregating $2,465,909.  The claims upon which these judgments were based represented the greater part of the floating debt of the company, and belonged to the Illinois, Missouri & Kansas association.

It is insisted by counsel that the judgments rendered on these claims and the decree for the sale of the road to

4. EQUITY OF STOCK-HOLDERS WHEN DIRECTORS BUY CORPORATE OBLIGATIONS AT A DISCOUNT.

pay them were fraudulent and void, because the directors of the North Missouri Railroad Company were also members of said association which bought these debts at a discount, because the suits were not brought in the name of the said association, but in the name of individual members thereof, and because of a stipulation contained therein to purchase, through judgments obtained on these debts, that portion of the property of the North Missouri Railroad Company not covered by the second mortgage.

While the evidence shows, as contended for by plaintiffs, that the directors of the North Missouri road were subscribers to the stock of the Illinois, Missouri & Kansas association, it also shows that they were creditors of said company to a very large amount, and also stockholders, some of whom had indorsed the obligations of the company and were liable for a considerable portion of its debts. It also shows that a number of persons who had not, in any manner, been connected with the North Missouri road, except as creditors, were also subscribers to said association in the sum of $2,480,000. In the face of these facts we cannot say, as we are asked to do, that the Illinois, Missouri & Kansas association was a corrupt and fraudulent combination because of the following stipulation contained in its articles, viz. : " The North Missouri Railroad Company being in default on its second mortgage interest, this association shall protect its interests in the premises by a purchase of said road through a sale under said second mortgage, and in case said road fails to pay its floating debt, as it matures, judgment shall be obtained on account of any floating debt controlled by this association and title to all property of said railroad not covered by its mortgages shall be obtained by sale under said judgments."

The evidence shows that at the time the articles of association were entered into a sale of the road under the second mortgage was inevitable, and also that a small portion of said road in St. Louis and Kansas City together with depot buildings and grounds in each of these places,

were not included in said mortgage. The stipulation of the creditors of the road to purchase these unincumbered portions of it through a sale on judgments obtained on its floating debt was not *per se* fraudulent. It is not fraudulent for a creditor or number of creditors to determine to obtain judgments on demands justly due from a railroad company, subject its property to a sale thereunder by a proper decree and purchase it at such sale. Nor do we think that the simple fact that the debts were bought up by the association at a discount of twenty five per cent., as the evidence shows some of them were, nor the fact that suit was not brought by all the members of the association, but in the name of individual members, would render void the judgments complained of.

Conceding for the argument that, notwithstanding the fact that a great number of persons who had in no manner been connected with the North Missouri Railroad Company, except as creditors, were subscribers to the extent of $2,500,000 to the Illinois, Missouri & Kansas association, in conjunction with the directors of the North Missouri Railroad Company ; that the purchase of these debts by the association is to be put upon the same footing as if made by the directors solely and on their own account, the effect of such purchase would not be, either in law or morals, to discharge the debt and absolve the said company from its obligation to pay. The only effect it would have would be to limit their recovery against the company to the amount actually paid for the debts. *Lingle v. Nat. Ins. Co.*, 45 Mo. 109. It is not pretended that the floating debt of the company was not valid and just, nor is it claimed that any defense could have been successfully interposed, had the original holders instituted suit against the company. If the suits instituted by Hoge and other individual members of the association for the recovery of judgments on the floating debts had been defended by the company on the ground that the debts belonged to the association of which the plaintiffs were members, and that the direc-

tors of the North Missouri Railroad Company were members of said association, and that the debts had been bought up for less than their face, the result would not have been the dismissal of the suits, but an amendment of the petition by adding the names of all the members of the association or partnership, and the rendition of a judgment for the amount actually paid, in the event that the court determined they were purchased at less than their face, and that the purchase was a purchase solely by the directors. We apprehend that if a direct proceeding had been instituted by the North Missouri company, or these plaintiffs, to vacate the judgments and decree founded on them for the causes here alleged as fraudulent, the utmost relief to which they would have been entitled, admitting the debts to be due and unpaid, would have been a diminution of the judgments to the amounts actually paid for the debts upon which the judgments were founded. If that would be the measure of relief in a direct proceeding, it certainly can be no greater in a collateral one. The plaintiffs do not seek relief on such terms, but ask to have that done in a collateral proceeding which could not be accomplished in a direct proceeding.

The sale of the road in 1871 by Humphreys and Vail, trustees in the second mortgage, being unimpeachable for the reasons indicated in this opinion, it follows that the sale of 1872 under the decree of the United States circuit court had no other effect than to pass title to the property of the North Missouri Railroad Company which was not covered by the said mortgage; and before there could be a divestiture of that title in favor of plaintiffs, equity would at the very least require them to pay the amount actually expended in the purchase of the floating debt. It would be unconscientious to restore to the North Missouri Railroad Company the property thus sold upon any other terms, when the judgments, if diminished twenty-five per cent. (that being the rate of discount at which plaintiffs claim they were purchased) would still show of the float-

ing debt unpaid the sum of $1,849,432, for the payment of which it would be unquestionably liable.

Our special attention has been called by counsel, who have thorougly and with great ability presented the case of plaintiffs, to the cases of *Jackson v. Ludeling*, 21 Wall. 616, and *Railroad Company v. Bowler*, 9 Bush 468. We have examined these cases, and have been unable to perceive the analogy between these and the case at bar. Without entering into a analysis of them for the purpose of showing the points of difference, it will suffice to say that in both of them are disclosed the most open, positive, direct and actual frauds on the part of those charged with the management of the trust property, and in one of them the parties were shown to be guilty of bribery.

In the case before us the evidence offered by plaintiffs not only shows an entire absence of actual fraud, but develops the fact that in 1867 the directors had on their hands for management and construction a road wholly without resources, largely in debt, operated only at a loss, and in which, but for their action, all the stock of the stockholders would have been extinguished in 1868 by a sale under the first mortgage. A stockholder in a railroad company has an interest in the net earnings of the road, and when the company is dissolved, an interest in the property left after the payment of debts. Measuring the interest of the stockholders in the North Missouri Railroad Company by this standard, the evidence clearly shows that it was valueless from 1867, that the road owed more than it could pay, and that loss and not profit was the result of operating it. The enterprise in the light of the evidence seems to have been an unfortunate one. The road started' with a gauge different from that of any other road with which it connected, and had to be changed in 1867; the State lost its loan of $4,350,000, which, with the interest, amounted to $6,237,000 in 1868; contractors failed in their contracts, stockholders were subjected to loss; it cost greatly more to run the road up to 1871, when it was sold, than it earned,

and since the sale it has been operated at a loss, the evidence showing that between August, 1871, and December, 1874, the time this case was tried, there was expended $2,850,614 more than was earned; of which $2,240,555 were expended in construction. Judgment affirmed with the concurrence of the other judges.

REVERSED.