CHARLES FOLLANSBE, Appellant, *v.* JAMES P. KILBRETH and HARVEY DECAMP, Appellees.

APPEAL FROM COOK COUNTY COURT OF COMMON PLEAS.

Where a person purchases property as the agent of another, though he may have the deed or contract of sale made out in his own name, the principal, from the moment of the purchase, acquires an equitable title thereto, subject to all the incidents attaching to such an estate, and the agent holds it in trust for the principal.

An equitable title derived under such circumstances may be divested out of the *cestui que trust* otherwise than by alienation, before the trust is actually performed. If the trustee has practised any fraud toward his *cestui que trust,* the latter may, when he discovers the fraud, repudiate the acts and purchase of the trustee, and thus divest himself of his equitable title, or he may waive the fraud and claim his rights as *cestui que trust;* or, before he has discovered the fraud, he may treat the purchase as his own by selling his equitable title. The *cestui que trust* may also divest himself of his equitable title by laches, fraud, or by agreement.

A court of equity will not permit a *cestui que trust* to show a speculative disposition toward his trustee. If a *cestui que trust* discovers facts which would give him a right to repudiate the acts of his trustee, and has investigated them, or had a resonable time to do so, he is bound to declare whether he will avail himself of the right or not, and cannot lie by in a position to affirm the bargain, if a profitable one, and repudiate it if it is a losing one.

Where a *cestui que trust,* having a right to repudiate a transaction, laid by for three years, and suffered his trustee to go on and make payments for the property ; *Held,* he was not entitled to relief.

THIS was a bill in chancery, filed February 17, 1854, in the Cook County Court of Common Pleas, by the appellees against the appellant, praying for a decree, declaring the defendant to be a trustee of the complainants of block 57, Canal Trustees subdivision of Sec. 7, T. 39 N., R. 14 E., and for a conveyance, &c. It appeared that on or about the 7th of November, 1848, the defendant purchased the above block for $1,500 ; $500 of which was paid by a conveyance of 80 acres of land, belonging to the defendant in McHenry county ; $250 was paid in cash; and the remainder on the 6th of September, 1849, 1850 and 1851. The defendant took from the vendor a bond to himself, for a

Follansbe v. Kilbreth et al.

deed when the deferred payments should be made. The bill sets forth a voluminous correspondence between the parties, showing that the defendant purchased the property as the agent of the complainants and one Person, who had since transferred his interest to them, and that the taking of a bond for a deed to the defendant was contrary to their instructions.

The answer sets forth a further correspondence between the parties showing that the defendant executed his own bond to the complainants and Person for the conveyance of the property, upon payment of the sum of $1,500, less $375 in the defendant's hands, in three annual installments, due on the 1st of September, 1849, 1850 and 1851; and claiming that they had accepted of the relation of vendee of the defendant, and were bound by the term of the contract.

As an excuse for not making the payments at the times when they became due, the complainants alleged that the defendant misrepresented to them the value of the land purchased; and had paid his own land toward the purchase at the nominal sum of $500, when in truth and in fact it was only worth $100 or $200 at the time. Evidence was introduced to support these allegations.

The other facts in the case sufficiently appear in the statement of them in the opinion of the court.

C. BECKWITH and A. HUNTINGTON, for Appellant.

G. GOODRICH, for Appellees.

CATON, J. I agree with the position assumed by the complainants' counsel, that when the true character of this original transaction is fairly understood, the positions of the parties must be considered as that of principals and agent, and that the land was purchased by Follansbe in trust for the complainants, although the purchase was nominally to himself. Nor do I deem it essential to inquire whether their subsequently treating him as their vendor without objection, changed that relation so as to entitle him to insist upon the rights of a vendor instead of a trustee. If he is entitled now to the position of a vendor, there is no pretence for inferring a specific performance against him by reason of the inexcusable *laches* of the purchasers, so that the first bill which was filed with that view was no doubt properly dismissed. We shall, for the present, consider the case, assigning to Follansbe the position of agent and trustee. Considering such to be the case, the complainants acquired an equitable title to the premises the moment the purchase was made, which was at the time subject to all the incidents attach

ing to such an estate. It is assumed on the part of the complainants that such an interest could not be divested except by alienation. They assert that when a trust once exists it must always continue till it is performed. In this they are undoubtedly mistaken, as may be shown by the very case made in this bill. Admitting the fraud which is charged against Follansbe, and they have undoubtedly a right to repudiate his acts in purchasing the land and taking the bond for a title to himself, and compel him to assume all the responsibilities of a purchaser, or they might waive the fraud and claim their rights as *cestui que trusts.* Or they might, before they discovered the fraud, considering themselves bound by the acts of their agent, treat the purchase as their own, and sell their equitable title, which would undoubtedly be a valid sale. Or, not having sold, they might, when they discovered the fraud, abandon it on account of the fraud. By adopting the latter course they would, no doubt, divest themselves of that equitable title to which they had a right to assert a claim, and which was actually vested in them till the time of such renunciation. In this case, then, they would become divested of an equitable title in or right to land, without any alienation. These rights must be reciprocal when circumstances are so changed as to leave an option of election in the trustee, whether he will recognize further the existence of an equitable title in the *cestui que trusts,* as, where they may have been guilty of a fraud in inducing the trustee to act for them and incur personal responsibilities which he would not have undertaken but for the fraud practiced upon him. Such a case of fraud might, no doubt, be supposed on the part of the principals as would justify him in repudiating the agency, and thus, without their consent, would the principals be divested of their equitable estate, which till then would have existed, and which would have continued to exist had the agent chosen to have recognized it. Again, such equitable estate might, no doubt, be destroyed by the mutual agreement of both parties, without fraud on either side. Nor am I prepared to say that such an estate might not be defeated by laches, or subsequent misconduct on the part of the principals or *cestui que trusts.*

Let us address ourselves to the case in hand and apply these principles to the facts before us.

The complainants resided in Ohio, and the defendant in Chicago, where the premises in question are situated. In November, 1848, the defendant, as the agent, and for the benefit of the complainants, purchased the property in his own name for fifteen hundred dollars, of which he paid five hundred in a lot of land which he owned in McHenry county, and two hundred and fifty in money, and gave his obligation to pay the balance

in one, two and three years, with six per cent. interest. The purchase was approved by the complainants, who received a certified copy of a bond for a deed to themselves from the defendant, which had been executed and recorded, and miscarried in the mail. This bond obligated the defendant to convey the land to the complainants upon their paying to him the fifteen hundred dollars, one-fourth down, and the balance in three equal annual installments. No objection was then made or subsequently, till this bill was filed, that the defendant originally purchased the land in his own name instead of the complainants. At the time of Follansbe's purchase he had in his hands three hundred and seventy-five dollars of the money of the complainants for the purpose of investment in land, which was sufficient to pay the first installment. Before the second payment fell due Follansbe wrote to the complainants to put him in funds to meet it, which they neglected to do. This payment fell due on the 1st of September, 1849. Up to this time their correspondence shows that the complainants felt perfectly satisfied with the purchase and with the course of the defendant in relation to it, but it is quite apparent that as they resided at a distance, they derived their information in relation to the value of the land solely from Follansbe, and placed implicit confidence in his integrity and representations. In the latter part of September, 1849, Kilbreth, one of the complainants, visited Chicago and examined the premises, and made inquiries as to their value, and for the first time expressed dissatisfaction with the purchase; and shortly after, on the 24th of November, Person, another of the purchasers, wrote to the defendant accusing him of fraud in misrepresenting the value of the land, and offering to take it at one thousand dollars. To this the defendant replied, vindicating himself, but, I confess, without satisfactorily explaining the representations he had made as to the value of the land, and the prices at which contiguous land had been sold. The defendant concluded that letter in these words: " Now all I ask of you is to remit me the payment on this purchase now due, or forever hereafter hold your peace." To this letter no answer appears to have been given, nor was the money remitted as requested, but the defendant was left to pay the purchase money with his own funds.

When Kilbreth, one of the complainants, was in Chicago, in September, 1849, after the second payment fell due, he employed Mr. Rees, a land agent in Chicago, to examine the title, and with him examine the land. At this time he appears to have been dissatisfied with the purchase. And he then told Rees that he did not intend to make any further payments on the property, or under contract, or on the bond, to Follansbe,

(in his various examinations he uses all three expressions,) unless the land should increase considerably in value. He left Chicago without making any payment to the defendant, or putting him in funds with which to make the payment, then overdue, on the original purchase. Nor did they put Follansbe in funds, or make the subsequent payments as they fell due. Nor do they appear to have taken any further notice of the purchase, or to have done anything in relation to it subsequent to the correspondence above referred to, till nearly three years after, and after the time for making the last payment had expired. In October, 1852, they appeared and tendered to the defendant the amount due on the bond which he had given them for a conveyance.

We cannot hesitate to say that here was a clear abandonment of whatever rights they had in the purchase made by the defendant for them as their agent or trustee. They had an undoubted right to a reasonable time to investigate the conduct of their agent; and, if they found he had practiced a fraud upon them, to repudiate the purchase, and make him assume its responsibility ; but, in doing so, they must necessarily relinquish to him its benefits. For this there was an abundance of time prior to the maturity of the second payment. They did make such investigation, and condemned his conduct, and refused to go on with the purchase. This is apparent, from the fact that they refused to put him in funds or make the payment then due, and from the letter which Person wrote to him in the November following, in which they not only decline to go on with the purchase upon the original terms, but propose a new arrangement, and to take it at onethird less, but above all is their intention apparent not to hold themselves bound by the purchase in the declarations made by Kilbreth to Rees, at the time he was in Chicago, in September, 1849, in which he declared they would make no more payments unless the land rose considerably in value. Now this declaration shows unequivocally an intention to speculate on the chances of an enhancement in the value of the land. He made no complaint of a want of information on the subject, and no doubt or objection to the title ; but the value of the property was the only point involved in his consideration of the subject. On this point there can be no doubt he fully informed himself, and upon the value, as it then stood, he chose not to go on with the purchase, reserving to himself, if he might do so, the right to reserve the benefits of it, should it subsequently rise in value, so as to make it a good speculation. This speculative disposition is as repulsive to a court of equity, in a *cestui que trust*, towards his trustee, as in a purchaser towards his vendor. The one is as much bound to deal fairly as the other. The law must prohibit the

one as much as the other from speculating upon chances or future events. Granting to the complainants the right to repudiate this purchase, and throw it upon the hands of the defendant for any cause, he had a right to know whether they would avail themselves of that right, so soon as they discovered the facts which conferred upon them that right, and had investigated, or had a reasonable time to investigate, the facts by which their election to affirm or disaffirm his acts was to be controlled. They had no right to hold him in suspense while they could take the chances of the fluctuations in the value of the land. An attempt was made upon the argument, which is also apparent in the examination of Rees, to avoid the effect of his testimony, by insisting that Kilbreth did not intend to repudiate the original purchase made by Follansbe, for them, as their trustee, but that he had reference solely to the purchase they had apparently made of him, by accepting his bond for a deed; but this distinction will not bear the scrutiny of an impartial examination. It is very apparent that Kilbreth, at the time, had no such distinction in his mind, but that his declarations were made in reference to the whole transaction, and to whatever right they had in it; and that he intended to make no further payments towards the land, in any way, unless it should rise in value. Unless such rise should take place he intended to throw the land, and all consequent responsibilities, upon Follansbe. Had he intended to abandon any rights under the bond, and to insist that the original purchase was made for their benefit, he undoubtedly would have so explained himself at the time.

This distinction must be looked upon as an after thought. Nor will it do to say that Kilbreth was ignorant of the law, and did not know that he had a right to claim that the original purchase was made in trust for them, and that Follansbe was only their trustee, and, hence, not knowing it, he could not assist their rights against him in that capacity. Knowing the facts, he was bound to know the law, and the defendant was no more bound to wait three years for them to learn what were their legal rights, than he was bound to wait to see whether the property would rise in value or not. During that time Follansbe was bound to meet the payments upon the land, and he had a right to know whether he was making those payments for himself or for them, and whether he had a right to dispose of the land in the meantime, to protect himself, should an opportunity offer.

But it was said that the complainants had not yet been able to learn whether the title which Follansbe had purchased was good or not, and that they had a right to know what the title was, before they decided whether to avail themselves of the benefits of the purchase or not. Whether this be so or not, it

is very certain that the question of. title had no influence on the minds of the complainants in determining on the propriety of the purchase. No doubt or question seems to have arisen on that point. Had any arisen, and the records were not satisfactory, the most natural and proper inquiry would have been of the defendant, had he really desired to have his doubts solved, who could have given him a satisfactory explanation at once. No such inquiry seems to have been made, and we are constrained to the conclusion that his conduct was not controlled in the least degree by any question as to the title. If it was, then he acted unfairly, by not applying to the defendant, and giving him an opportunity of satisfying him on the subject. It is evident that this question of title was also an after thought.

Even after all that Kilbreth did in September, when in Chicago, and after Person's letter in November following, evincing a settled disposition not to be bound by the purchase in any way, or to make any further payments on it, Follansbe wrote them, giving them still an opportunity of reconsidering the matter and completing the purchase, and admonishing them that if they still persisted in refusing to do so, he should acquiesce in their election to throw the purchase upon his hands, and to assume it on his own account; and still expressing the opinion that it would turn out an advantageous operation. Such is the effect of the defendant's last letter to Person. To this letter no answer appears ever to have been made, and no funds were sent. If what had previously transpired was not conclusive upon the complainants, as an abandonment of the purchase, their profound silence for nearly three years after this correspondence must surely be construed into an acquiescence in the proposition of the defendant, that they would hold their peace. The defendant had a right so to understand their silence. Unless we can say that they had a right to lie by, indefinitely, to see if property would not rise in value, so as to make the purchase a speculation, and, if it should fall in the market, to throw the loss on the defendant, and, if it should rise, to claim the advance as their own, we must conclude, from all that took place, that they abandoned the purchase. Unless the defendant was deprived of all rights to protect himself,—unless they could compel him to make all the payments and run all the risks, and then, after waiting as long as they chose, adopt or reject his acts as subsequent events might dictate, they must be held to have abandoned the purchase. Admitting that Follansbe had paid too high a price for the land, fraudulently and for his own advantage, as charged in the bill, there was still some limit to the extent of their rights; nor was he deprived of all his. The greatest malefactor has rights, which courts of justice will protect; and the

defendant, admitting the truth of all that is charged against him, is not in a worse condition. He was not entirely at the mercy of the complainants. They were bound, in a reasonable time, to decide definitely whether they would adopt or repudiate his acts; and, having decided, they were bound by it. They could not, after having charged the defendant with fraud, and, in consequence thereof, repudiated his acts, and refused to advance the money to meet the payments, leaving him to make them, come in, after three years' silence and acquiescence, and revive their claim, and seize upon a speculation which, in the mean time, had become inviting, by a rise in the property, which they did not anticipate, or of which, at least, they wanted confidence. If, when Kilbreth was in Chicago, in September, 1849, they intended to repudiate the relation of vendor and vendee, as between themselves and the defendant, and to assert that of trustee and *cestui que trusts*, justice and equity required that he should then have declared his intention, and have met the responsibilities of the position thus assumed, by paying the money due from them on the purchase. But they avowed no such intention, nor did they evince any by their conduct. If they kept silence when equity required them to speak, they cannot be allowed to speak when equity requires them to keep silence. This is an old maxim, and applicable to the case before us. We think the complainants have not made out a case for the relief prayed, and that the bill should have been dismissed. For convenience, I have treated the case as if Person had not sold out to his associates, and was one of the complainants, as it could make no difference in the result.

The decree must be reversed and the bill dismissed.

*Decree reversed.*