WILLIAM H. HILL, JR. *vs.* BORDMAN HALL & another.

Suffolk. January 25, 1906. — March 7, 1906.

Present: KNOWLTON, C. J., MORTON, LATHROP, HAMMOND, & SHELDON, JJ.

*Attorney at Law. Sale,* Rescission. *Equity Jurisdiction. Evidence,* Extrinsic affecting writings. *Bills and Notes.*

An attorney at law who bargains with his client in a matter of advantage to himself, if the transaction is to be sustained in equity, must show that he fully and faithfully discharged his duty to his client not only by refraining from any misrepresentations or concealment of any material fact but by exercising active diligence to see that his client was fully informed of the nature and effect of the transaction and of the attorney's interest in the matter involved.

An attorney at law who bargains with his client in a matter of advantage to himself must see to it that his client either has independent advice or receives from him such advice as he would be expected to give him in a transaction between the client and a stranger. The attorney must see to it that his client is so placed as to be enabled to deal with him at arm's length without being swayed by the relation of trust and confidence which exists between them.

If two attorneys at law sell to a client, whom they know to be not clear headed and ignorant of property, $13,000 par value of bonds of a street railway company belonging to a construction company partly or wholly owned or controlled by them for the sum of about $12,000, which they have just received for their client in a settlement made in his behalf and which they know to be his whole property excepting a life interest in $35,000, without warning him against putting all of his property into one investment or warning him that the success of the investment depends on all the bonds of the railway company being sold and being sufficient to build and equip the road whereas only $10,000 of the bonds have been sold out of a proposed issue of $175,000, and without disclosing to him the facts known to them that the financial condition of the construction company which owns all the stock and all the unsold bonds of the railway company is such that its money is kept on deposit in the treasurer's name to protect it from attachment, that it owes the attorneys personally for advances made more than six months before, and that the bank balances in the name of the treasurer amount to only $84, the client may maintain a suit in equity against the attorneys to rescind and set aside the sale, and is entitled to a decree that on tendering a transfer and delivery of the bonds to the attorneys they shall repay him the money.

If an attorney at law, who has received a large sum of money in settlement of negotiations which he has been conducting for a client, within one hour from the receipt of the money settles with that client and, after deducting the amount of his fees and charges, pays the principal part of the balance to his client not in money but in bonds which he sells to him, the relation of attorney and client still exists when the sale is made.

As between the original parties to a promissory note it can be shown by oral evidence that the note although delivered was only to become binding in case the maker sold certain bonds placed in his hands as agent to be sold.

In a suit in equity against two attorneys at law to rescind and set aside a sale of certain bonds made by them to the plaintiff when he was their client, the plaintiff may be found not to have lost his right to relief by a delay of a little over seven months before tendering the bonds to the defendants and demanding the purchase money or filing his bill, if during six of the seven months one of the defendants had possession of the bonds under an agreement of option, given at that defendant's request, to buy the bonds at a price higher than that which the plaintiff paid for them, and the plaintiff filed his bill one month after the option expired and apparently as soon as he got actual possession of the bonds, there having been during the seven months no material change in the circumstances which the defendants ought not reasonably to have anticipated.

SHELDON, J.   This is a bill in equity brought against two members of the bar to recover money claimed to have been wrongfully obtained by them from the plaintiff, their client.

The case was heard before a single justice of this court; and the evidence was taken by a commissioner.   The justice filed a statement of his findings, and ordered a decree for the plaintiff. The defendants have appealed from this decree, and the case comes before us on the commissioner's report of the evidence. The statement of the findings of the single justice is also before

us in the same way as in *Cohen* v. *Nagle*, 190 Mass. 4. The justice found for the defendants so far as the bill proceeds on the making of false and fraudulent representations of fact which could support an action of fraud and deceit at law in the case of parties rightfully dealing with each other at arm's length; and further found that the facts which gave rise to this litigation are as follows:

In January, 1904, the plaintiff was employed by the defendants to act for a client of theirs in taking account of stock in a partnership in a jewelry store in Hanover Street, which was being wound up, their client being one of two partners. This work was finished on Saturday, January 16, and for this he received $65 on Wednesday, January 20, being at the rate of $5 per day. At or about this time the plaintiff told the defendants that he had been out of work for over two years, and that he wanted work. He said that he had been employed for five years as a clerk in the Boston and Bangor Steamship Company, and for two years as purchasing agent in the purchase of food for the boat under the superintendent, receiving as purchasing agent and for the last year or two as clerk $1,500 a year; that he lost his place when his father, W. H. Hill, a member of the banking firm of Richardson, Hill and Company, sold the controlling interest in that steamship company.

The defendants are members of the bar, having offices together. There was a common outside door, and an outside room in which the stenographer sat, who did work for each, but each had a separate private office. The defendants at this time were interested in the Rockland, South Thomaston and Owl's Head Railway. This was a corporation organized under the general laws of the State of Maine in 1902, with a capital stock then fixed at $150,000. Under date of October 1, 1903, it had executed a mortgage upon its property and franchises, then owned and thereafter to be acquired, to secure an issue of $175,000 of five per cent bonds. All the shares in its capital stock not issued to qualify directors, all its bonds and all its cash (namely, cash derived from stock issued to qualify directors not spent), had been issued and transferred to one William E. Hingston, a man of straw, in consideration of a contract by Hingston to construct and equip the road. This contract was assigned by Hingston to

a corporation called the Coast Line Construction Company, and was assumed by that company.

Apparently it was the original intention that the Coast Line Construction Company should secure the building of the road by letting out the work to contractors, as the railway company would have done had no assignment of its stocks and bonds been made to the construction company. But in fact contracts for those purposes were made to a large extent in the name of the railway company, because the construction company had no credit, and the railway company did have a credit. Contracts so made were then assigned by the railway company to the construction company, and were assumed by it. This contract with Hingston, assigned to and assumed by the construction company, was resorted to as a device for issuing the stock as fully paid and non-assessable stock. As the construction company by this device became the holder of all the stock of the railway company, the persons really interested in the scheme were the holders of stock in the construction company. On February 5, 1904, certificates No. 9 for one share, and No. 10 for six shares of stock in the construction company were issued to the defendant Dalton and the defendant Hall respectively. The wife of the defendant Hall owned one hundred shares in the construction company. These certificates were signed by the plaintiff Hill as vice-president and by the defendant Dalton as treasurer, and were marked cancelled when put in evidence at the hearing. The defendant Dalton was the treasurer and one of the directors of the construction company and treasurer of the railway company. Beyond this nothing appeared as to the organization of the construction company, the amount of its capital stock, how it was paid for, to whom it was issued, or by whom it was held in January and February, 1904. The defendants were interested in it, and it did not appear that any one else was interested in it except the wife of the defendant Hall. The defendants seemed to have full control of it without consultation with others. So far as the plaintiff was concerned, and so far as the plaintiff's dealings with it or its securities were concerned, the defendants, and no one else, acted for the construction company. No further findings were made upon this question because the plaintiff did not at the hearing make the fact that the defendants were

the construction company a part of his case, although he contended for that in a written argument submitted to the single justice, and has argued before us that the evidence shows this to be the fact.

All that the railway company had in January and February, 1904, was its charter as a corporation under the general laws of Maine; a location of a railway from the town line of Rockland to South Thomaston, with a branch to Crescent Beach and Owl's Head; two acres given to it by South Thomaston; and an exemption from taxation for five years. All that the Coast Line Construction Company had was the stock and bonds of the railway company, with the following exceptions: It had sold $10,000 par value of the bonds of the railway company, $6,000 at 80, and $4,000 at 90, making $8,400 in all. How this $8,400 had been expended did not appear. The defendants Dalton and Hall had advanced, before these bonds were sold, the necessary money to pay engineer's expenses and travelling expenses, beginning in July, 1903; no one else had advanced any money to the enterprise, and at the time of the trial they had not been repaid those advances. It had at that time two bank accounts, one in the Federal Trust Company, and one in the First National Bank in Boston, standing in the name of the defendant Dalton as trustee, the accounts being put in his name in order to protect them from attachment. On February 1, 1904, there was to the credit of these trustee accounts in the Federal Trust Company and in the First National Bank, $77.39 and $6.75 respectively.

After the bonds of the railway company were issued, in October or November, 1903, one Borhek was busy in putting them on the market in the neighborhood of Rockland. He spent three weeks in working through the district of Rockland and the country for twenty miles around it. Then he came back to Boston, made up a report, had it printed, and mailed a copy of it to every taxpayer in Knox County, in which Rockland is situated. He then returned to Maine to follow up prospective customers, and remained there for that purpose until Christmas.

Some time in January, 1904, and before the *habeas corpus* proceeding hereinafter spoken of was begun and the question of the plaintiff's right to the person of his son came up, it was suggested that the plaintiff might sell some of the railway company's

bonds, and that from his familiarity with Rockland through his connection with the Boston and Bangor Steamship Company, whose steamers touch at that port, he could be useful in transportation matters; and it was tentatively proposed that he should go to Maine, when the road was put in operation, and take charge of such matters for the railway company as its secretary. There were allotted to the plaintiff by the defendant Dalton $40,000 par value of the bonds, to be sold by him on these terms: For the bonds sold the Coast Line Construction Company was to receive $35,000; and the plaintiff was to keep all he got over that sum, and was to have $4,000 par value of stock. In execution of this arrangement seven notes for $5,000 each, payable to the plaintiff, were signed by the plaintiff, indorsed by him, and handed to the defendant Dalton, who kept them until February 24, 1904. There was no sale of the bonds to the plaintiff; the notes were not delivered by the plaintiff as his obligation, were not founded on a valid consideration, but were written out as a statement of the money to be paid by the plaintiff if the bonds were sold, in which event alone was he to make any payment for them, or have any right to them or any of them, beyond the right to sell them as aforesaid; and the notes never became a legal obligation. These notes and the bonds were then taken by the defendant Dalton and kept by him. Before this time, the defendants had stated to the plaintiff that the road had a very valuable franchise, that the bonds were selling at 90 or 92, that it was bonded for only $17,000 a mile, while the Camden Street Railway, with which it was connected, had a bond issue of $35,000 to a mile, and was paying good dividends; that the Thomaston and Owl's Head Railway's bond issue would be much less than that per mile, and that would insure paying a good dividend. The plaintiff also had been furnished by the defendants with a glowing prospectus of the road.

On or before Saturday, January 30, 1904, the plaintiff consulted the defendants as to his right to the custody of his child, which was born on June 8, 1899, and since had lived in the household of the plaintiff's father, the child's mother having died shortly after its birth; and on Sunday, January 31, the plaintiff and the two defendants as his counsel had an interview with the plaintiff's father at the father's house in Brookline; and on Feb-

ruary 2 a petition for *habeas corpus* for the possession of the child was filed in this court. Between February 2 and February 15, the deposition of the plaintiff's father was taken. In this connection the defendants had the opportunity, and it became their duty, to get a thorough knowledge of the plaintiff and to become familiar with his past life; and they did so. The controversy involved in the *habeas corpus* proceeding was not gone into at the hearing in this case, on the ground that it involved a family scandal; but the plaintiff's father resisted giving the plaintiff the custody of the child on the ground that the plaintiff was not fit to have it.

The plaintiff took the stand and testified. It was found that in January and February, 1904, he was a man of twenty-nine years of age, inefficient, not clear headed, altogether ignorant of affairs beyond matters of a clerical nature, ignorant of property and ignorant of the investment of property, and that the property hereinafter mentioned received by him was the first property he had ever had; and all this was known by the defendants.

The petition for the custody of the child was settled without coming to a hearing, on these terms: The plaintiff yielded the custody of the child to his father, renounced all claim in the estate present or future of his father and grandfather, and the father put $35,000 in trust for the plaintiff for life with remainder to his son, and paid the plaintiff $20,000. The papers in this settlement were passed at the office of the City Trust Company, in Boston, on February 24. The $20,000 check was handed to the defendant Dalton by the representative of the plaintiff's father in the office of the president of the trust company, while the plaintiff was in the outer room. Dalton and the plaintiff then went to the defendants' office, where they found the defendant Hall. Dalton then produced the check, and at the plaintiff's request, got it cashed, and brought $20,000 in money back with him to the defendants' office. The defendants then told the plaintiff that their fees were $3,000 apiece and $175 cash expenses, or $6,175 in all, leaving $13,825. The plaintiff said he wanted $2,125 to pay his debts and for his immediate wants, and wished to invest the rest in a part payment on the $40,000 par value of bonds allotted to him for sale. This the defendants refused to allow him to do, because, as they testified, they had

become satisfied that he could not sell bonds among the custom-
ers of Richardson, Hill and Company, — as they originally had
thought that he could, — or anywhere else; but they said that he
could buy outright as many bonds as he wished on the terms
agreed on for the $40,000.   He thereupon paid the defendants
$11,700, and became entitled to $13,000 of bonds of par value.
Of this $11,700, $1,000 went to the defendant Hall in payment
for sums advanced and to be advanced by him to the construction
company, and on account of legal services rendered by him to
that company; $5,000 was put to the credit of the construction
company in an account with the Federal Trust Company opened
when it was paid in on the next day, February 25; and the
remaining $5,700 was paid in to the aforesaid accounts of
J. H. Dalton, trustee, in the Federal Trust Company and the
First National Bank.

The justice ruled that the same rule of law governs this sale to
the plaintiff (a client of the defendants) of bonds by the Coast
Line Construction Company (for which the defendants, and
the defendants only, acted in this and all other dealings with the
plaintiff and in which they were interested as aforesaid) as obtains
where an attorney sells his own property to his client, namely,
not only to make to the client a full disclosure of all facts known
to the attorney, but to see to it that he has independent advice,
or to give him such advice as he, the attorney, would have given
to him had the sale been made to his client by a stranger; and
that the burden is on the attorney to show that he did so conduct
himself in the sale.

The justice found that there was no attempt on the part of the
defendants to fulfil this duty, and that they failed to fulfil it.
They knew the plaintiff thoroughly; knew that he never had
had any property before; knew that after deducting the fees
charged by them and what was necessary to pay his debts and
provide for his immediate wants, all he had (outside of a bare life
interest in the $35,000) or ever could expect to inherit was
$11,700; and this they allowed him to put into $13,000 par value
of the bonds of the railway company belonging to the construc-
tion company, in which they were personally interested, and for
which they, and they alone, acted in this transaction, without
warning him against putting all his property into one investment,

without pointing out to him that the investment was purely speculative in that success depended on all the bonds being sold and the proceeds being sufficient to build and equip the road; without telling him that only $10,000 of the bonds ever had been sold to other persons in spite of the strenuous efforts which had been made to sell them since October or November, 1903, and that $6,000 of these bonds had been sold at 80; that the finances of the company were then such that its money was kept on deposit in the treasurer's name to protect it from attachment; that it was then indebted to the defendants personally for advances which had been made by them from July, 1903, all of which remained unpaid, and that the construction company had in the bank accounts aforesaid only $84.14; and finally, that he, the plaintiff, had no binding agreement from any one to give him the employment he hoped to obtain from making the investment. In place of so doing, they left unrevoked previous statements (which it was found that they made) urging the plaintiff to take an allotment of bonds for sale at 90, telling him that he could soon sell them at a profit; and they completed their trade with the plaintiff at one sitting of less than an hour in their office.

The justice also found that there was nothing in the subsequent facts by which the plaintiff had lost the right to maintain this bill. He found that on March 4, 1904, the plaintiff, for a valid consideration, gave to the defendant Dalton a written option, under seal, to buy these bonds from the plaintiff within six months from the date, at $970 per bond, and that the defendant Dalton kept possession of all the thirteen bonds under this option until October 3, 1904. In April, the plaintiff received the interest due by the terms of the bonds. On July 17, 1904, he consulted counsel, and by the advice of counsel, on October 3, 1904, he tendered back to the defendants the bonds and the money received by him, with interest. It did not appear when the plaintiff was advised that he had a right to have his money back, nor why a demand on the defendants was not made earlier. The railway was to have been opened in June. On September 2, 1904, the railroad commissioners of Maine certified that they had made a careful inspection of four and thirty-five one hundredths miles of the railway of the Rockland, South Thomaston and Owl's Head Railway, and that they found the same so con-

structed as to be safe for public travel thereon. The railway is stated in the mortgage to be about ten miles and a quarter long, and was to go to South Thomaston and Owl's Head. The four and thirty-five one hundredths miles does not reach either place. It was stated in the prospectus that "the cost of building the road in a substantial manner. and thoroughly equipped should not exceed $19,000 per mile, making a total cost of $190,000." In September, 1904, all the bonds had been issued or pledged, and there were in addition disputed claims upon the railway or its property of at least $40,000. The road never has been opened for business.

We have carefully read the voluminous evidence which was taken at the hearing, and are of opinion that no findings of fact could be made which would be more favorable to the defendants. Indeed, we cannot avoid the conclusion that it well might have been found that the Coast Line Construction Company was merely a device adopted by the defendants, and that in reality the bonds which they sold to the plaintiff were their own property. It is not necessary, however, to go over the evidence upon this question in detail; for the decree ordered in favor of the plaintiff is amply supported by the findings which were made.

It is a well settled rule in equity, applicable to all transactions between attorney and client by way of purchases, sales or gifts, that the attorney who bargains with his client in a matter of advantage to himself must show, if the transaction afterwards is called in question, that it was in all respects fairly and equitably conducted; that he fully and faithfully discharged all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger. The attorney must see to it that his client is so placed as to be enabled to deal with him at arm's length, without being swayed by the relation of trust and confidence which exists between them. This principle is established both in England and

in this country. It is one example of the general doctrine which the law applies to dealings between parties who stand in a fiduciary relation to each other. *Smith* v. *Kay*, 7 H. L. Cas. 750. " The broad principle on which the court acts in cases of this description is that, wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed, to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him." Wood, V. C. in *Tate* v. *Williamson*, L. R. 1 Eq. 528, 536, affirmed in L. R. 2 Ch. 55, in which it is said by Lord Chelmsford, " Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed." So Lord Eldon says in *Gibson* v. *Jeyes*, 6 Ves. 266, 271, that an attorney can never support a purchase from his client unless he can prove that his diligence to do his best for the vendor has been as great as if he were only an attorney dealing for that vendor with a stranger ; that if he will mix with the character of attorney that of purchaser, he must show that he has given to his client all that reasonable advice against himself that he would have given against a third person. The same rule is laid down in *Savery* v. *King*, 5 H. L. Cas. 627. So Chancellor Walworth said in *Howell* v. *Ransom*, 11 Paige, 538 : " The attorney . . . can never sustain a purchase of this kind, without showing that he communicated to his clients everything which was necessary to enable them to form a correct judgment of the actual value of the subject of the purchase, and as to the propriety of selling at the price offered. And his neglect to ascertain the true state of the facts himself will not sustain his purchase." In *Merryman* v. *Euler*, 59 Md. 588, it is declared, with abundant citation of authorities,

that this doctrine is a rule of public policy, and that the burden is on the attorney to prove the good faith of any such transaction with his client. See also *Wood* v. *Downes*, 18 Ves. 120 ; *Huguenin* v. *Baseley*, 14 Ves. 273 ; *Williams* v. *Reed*, 3 Mason, 405 ; *Miles* v. *Ervin*, 1 McCord Ch. 524 ; *Condit* v. *Blackwell*, 7 C. E. Green, 481 ; *Dunn* v. *Dunn*, 15 Stew. (N. J.) 431 ; *Troxell* v. *Silverthorn*, 18 Stew. (N. J.) 330 ; *Kisling* v. *Shaw*, 33 Cal. 425 ; *Kidd* v. *Williams*, 132 Ala. 140 ; *Woodbury* v. *Woodbury*, 141 Mass. 329, and cases there cited.

The defendants do not directly dispute the correctness of the general principles which have been stated ; but they contend that at the time of their dealings with the plaintiff in reference to these bonds the relation of attorney and client did not exist between them. *Dockery* v. *McLellan*, 93 Wis. 381. They contend that what took place in January, before any such relation had been created or appears to have been contemplated by either of the parties, was an arrangement by which the bonds to the amount of $40,000 were set apart for him, that he gave his notes for $35,000 for these bonds, with the understanding that he should sell the bonds and should have all that he could get for them above the agreed price of $35,000, besides a bonus of stock ; and that the finding of the justice " that the notes were not delivered by the plaintiff as his obligation, were not founded on a valid consideration, but were written out as a statement of the money to be paid by the plaintiff if the bonds were sold, in which event alone was he to make any payment for them or have any right to them, or any of them, beyond the right to sell them as aforesaid ; and that the notes never became a legal obligation," cannot stand either as matter of fact or as matter of law.

But it seems to us, dealing with the question of fact, that not only was the finding warranted by the evidence, but it would have been difficult to justify any other finding. The conduct of all the parties is at variance with any other conclusion. Much of the defendants' own testimony indicates the same result. The real issue involved was not so much whether the plaintiff had put himself into such a position that the defendants or any one taking the notes from them for value could hold the plaintiff responsible for their payment, as whether any title or interest in the bonds had passed to the plaintiff; and the question whether

the notes had been delivered as binding agreements, and whether they were given for a valuable consideration, derived its importance from its bearing on this issue. We think that this finding must stand, unless the defendants' contention that it is contrary to law can prevail.

The defendants rely upon the well settled doctrine that it is not competent for the maker of a note to show that he gave it on the oral understanding that he was to be held for payment only upon the happening of some future contingency. *Torpey* v. *Tebo*, 184 Mass. 307. *Wooley* v. *Cobb*, 165 Mass. 503. *Currier* v. *Hale*, 8 Allen, 47. That is, he cannot by oral testimony contradict the written agreement which, for a valid consideration, he has executed and delivered. See *Taylor* v. *Goding*, 182 Mass. 231; *Merrigan* v. *Hall*, 175 Mass. 508; *Tower* v. *Richardson*, 6 Allen, 351. But it never has been doubted that when the question arises between the original parties it may be shown that a promissory note was given without consideration. And it is a question of fact whether any written agreement, though in the possession of the obligee, has been delivered by the obligor as a binding agreement, or whether any delivery that has been made is conditional only. *Elastic Tip Co.* v. *Graham*, 185 Mass. 597, 600, and cases there cited. *Stevens* v. *Stevens*, 150 Mass. 557. *Thomas* v. *Barnes*, 156 Mass. 581. Doubtless testimony to prove such a state of facts should be weighed with care; but the finding of the single justice as to these notes was warranted both by the law and the evidence, and we must adopt it.

The defendants contend that if the transaction by which the plaintiff bought these bonds did not precede the beginning of the relation of client and attorney between him and them, then it did not take place until after that relation had terminated, after the litigation in which they were employed had been settled and wholly brought to an end; and that this was an independent matter, wholly outside the scope of the defendants' employment as attorneys. *Hayne* v. *Rhodes*, 8 Q. B. 342. And it is true that when such a relationship has been completely dissolved, and the parties are no longer under its influence, but are able to deal and actually do deal with each other at arm's length, the principles which govern business transactions between parties who stand in a fiduciary relation to each other no longer prevail, but

the parties are in the same position and have the same rights and duties as would be the case with all other persons. Story Eq. Jur. § 313, and cases there cited. But upon the facts the case at bar cannot be brought within this rule.

The defendants were originally employed by the plaintiff to obtain for him the custody of the person of his minor child. But almost immediately the scope of their employment was much increased. Negotiations were begun and carried on under their advice and through them for the settlement not only of this question but also of all the relations between the plaintiff and his father, including the consideration which he should receive for a renunciation of all claim in the estate present or future of his father and grandfather. They charged themselves with the broad duty of protecting all his interests in this behalf. And that this was their view is sufficiently apparent from the amount of the fee which they charged for services, which was paid to them without objection, and which is not now made a subject of complaint. They received the sum of $20,000 in cash as a result of these negotiations and of the settlement which was made. Their sale of these bonds to him was a part of the settlement which they then made with him. The practical effect of that settlement was that they turned over to him these bonds instead of nearly $12,000 in cash which he was entitled to receive from them. It cannot be said that at this time the parties stood, or that the defendants had a right to think that they stood, at arm's length. Apart from the plaintiff's ignorance, inefficiency, and lack of clear-headedness, of which the defendants were aware, this sale took place within an hour of the receipt of this large sum of money, in the defendants' office, as a part of the transaction by which they turned over to him the proceeds of the litigation and negotiation which they had just completed as his attorneys. The rule has been well laid down by Lord Justice Turner that " where a relation of confidence is once established, either some positive act or some complete case of abandonment must be shown in order to determine it." *Rhodes* v. *Bate*, L. R. 1 Ch. 252, 260. The rule must be applied so long as the influence arising from the relationship exists, though this may extend beyond the continuance of the relationship itself; and this doctrine *a fortiori* must extend to the attorney's settlement with

his client of the very fruits of the litigation.   *Dunn* v. *Dunn*, 15 Stew. (N. J.) 431.

The defendants argue that the effect of these findings is to sustain the bill upon a different ground from that upon which it is brought; that upon the real issue of fact raised by the pleadings it was found that the claims of the plaintiff were not proved, and that his testimony was false and untrustworthy.   It is true that one issue tendered by the bill and accepted by the answer was whether the defendants had been guilty of any such fraudulent conduct or misrepresentation of facts to the plaintiff as would have given him the right to maintain an action for deceit against them if the parties had been dealing at arm's length ; and it is true that this issue has been found in favor of the defendants.   But the issue also is clearly raised whether the plaintiff is not entitled to relief upon the grounds which we already have stated.   The bill plainly avers the relation of trust and confidence between the parties, the influence thereby created, and the misuse of that influence.   The argument in favor of the defendants arising from the character of the testimony given by the plaintiff is entitled to serious consideration and has had its full weight.   We see no reason why the bill cannot be maintained.

The defendants further contend that the plaintiff's delay, after his purchase of these bonds on February 24, 1904, until October 3, 1904, before tendering them back and bringing this bill, is fatal to his right of relief, especially in the absence of any evidence to show why he did not make his tender and demand upon the defendants earlier, and in view of his knowledge of the condition of the property and the difficulties of completing the proposed railway.   At most, this delay was for a little over seven months ; it continued for only one month after the expiration of the option which on March 1 he had given to the defendant Dalton, at the latter's request, to buy these bonds for a higher price than that at which the plaintiff bought them.   And the suit appears to have been brought as soon as actual possession of the bonds was given to the plaintiff.   There had been in the meantime no new developments, no material change in the circumstances, other than what the defendants ought reasonably to have anticipated. The single justice who heard the case found as a fact that the

plaintiff had not lost his right to have back his money, and was not precluded from maintaining this bill. In *Twin-Lick Oil Co. v. Marbury*, 91 U. S. 587, apart from other differences, the delay which was held fatal to the plaintiff was longer than in the case at bar, and was made for the purpose of speculating upon the enhanced value of the property. Somewhat similar considerations apply to the other decisions relied on by the defendants. See *Johnstone v. O'Connor*, 21 App. Div. (N. Y.) 77; *Wade v. Pettibone*, 11 Ohio, 57; *Follansbe v. Kilbreth*, 17 Ill. 522. But in *Rochefoucauld v. Boustead*, [1897] 1 Ch. 196, a delay by the plaintiff for twenty-one years after the transaction and for twelve years after she gained full knowledge of the facts, was held not to be sufficient to deprive her of the right to relief, she having done nothing actively to lead the defendant to suppose that she had given up her claim. In *Savery v. King*, 5 H. L. Cas. 627, a delay of twelve years was held to be no bar. We cannot say that there has been such delay here as to prevent the plaintiff from recovering. *Tracy v. Banker*, 170 Mass. 266. *Morse v. Hill*, 136 Mass. 60.

This is not a bill against the Coast Line Construction Company for the rescission of a sale made by that corporation ; it is brought against these defendants for a sale made by them in their own right and largely for their own benefit. It is not material to consider what rights the plaintiff might have had against the corporation, if it had appeared that the defendants had been acting merely as its agents. Nor is there anything in the action which the defendants procured to be brought against the plaintiff by the Union Deposit and Securities Company and the attempted attachment of these bonds by trustee process which can prevent giving full relief to the plaintiff in this suit.*

No question is made or properly could be made but that the plaintiff has a right to come into equity to obtain relief by a rescission of the sale which the defendants made to him. See 3 Am. & Eng. Encyc. of Law, (2d ed.) 333, and cases there cited ; Pom. Eq. Jur. §§ 955, 956 ; Story Eq. Jur. §§ 310 *et seq.* ; Bispham, Principles of Equity, §§ 201, 236. This point was

---

* The action referred to was brought after the plaintiff had tendered the bonds to the defendants and demanded the return of his money, as described on page 261.

expressly decided in *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 188 Mass. 315.

But the defendants should not be required to refund the plaintiff's money without having the bonds returned to them ; and we are apprehensive that the language of the decree entered might be taken to require them to pay the money in the first instance, and then trust for obtaining the bonds to the order that the plaintiff transfer and deliver them to the defendants. We are of opinion that the decree should be that upon the plaintiff's tendering such transfer and delivery to the defendants they shall make the repayment of the money to him. With this modification, the decree must be affirmed ; and it is

*So ordered.*

*G. W. Anderson,* (*E. H. Ruby* with him,) for the defendants.
*E. I. Baker,* (*G. G. Davis* with him,) for the plaintiff.